**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

**IN THE MATTER OF THE**
**COMPLAINT FOR EXONERATION**
**FROM OR LIMITATION OF**
**LIABILITY OF DELOACH MARINE**
**SERVICES, LLC, AS OWNER PRO-**
**HAC-VICE AND OPERATOR OF THE**
**M/V MISS MOLLYE D**

**CIVIL ACTION**

**NO. 22-416-JWD-SDJ**

**RULING ON DELOACH MARINE SERVICES, LLC'S**
**CLAIM OF LIMITATION OF LIABILITY**

**TABLE OF CONTENTS**

I.  INTRODUCTION .................................................................................................. 3

II.  PROCEDURAL HISTORY ..................................................................................... 4

III.  SUMMARY OF PARTIES' POSITIONS ................................................................. 5

IV.  FACTUAL BACKGROUND & FACTUAL DISPUTES ............................................. 7

   A.  The M/V MISS MOLLYE D ........................................................................... 7

   B.  Joseph M. Giordano, Jr. – Employment with Deloach ....................................... 8

   C.  Joseph M. Giordano, Jr. – Training with Deloach ............................................. 9

   D.  Joseph M. Giordano, Jr. – On-the-Job Experience with Deloach........................ 12

   E.  Joseph M. Giordano, Jr. – Prior Experience with Waterway & Prior Accident .............. 14

   F.  Trip of MISS MOLLYE D from Departure Until Bayou Boeuf Locks ......................... 16

   G.  Trip of MISS MOLLYE D from Bayou Boeuf Locks Until Moments Prior to Allision . 18

   H.  The Allision ................................................................................................. 21

   I.  After the Allision .......................................................................................... 26

      1.  Alleged Lack of Investigation & Reporting of Incident ................................ 26

      2.  Wrong Overtaking Signal ........................................................................ 27

      3.  Giordano's Response to Twisted Tow........................................................ 28

      4.  Second Loitering Across the Channel......................................................... 29

      5.  Communication at Watch Change ............................................................. 30

      6.  Allision with Bridge Revealed by Coast Guard........................................... 30

V.  STANDARD – LIMITATION OF LIABILITY ......................................................... 31

VI.    DISCUSSION ............................................................................................................ 33

    A.    Deloach's Concessions – What Is Not at Issue................................................. 34

    B.    The Allision – Resolving Factual Issues.......................................................... 34

    C.    Licensure No Guarantee of Competence .......................................................... 36

    D.    Giordano's Incompetence with Rose Point....................................................... 37

    E.    Giordano's Rose Point Incompetence – Proximate Cause ............................... 42

    F.    Giordano's Rose Point Incompetence – Deloach's Privity & Knowledge ....... 44

    G.    Giordano's Broader Incompetence .................................................................. 47

    H.    Giordano's Broader Incompetence – Proximate Cause, Privity & Knowledge................. 56

VII.    CONCLUSION......................................................................................................... 57

## I.    INTRODUCTION

On December 23, 2021, the M/V MISS MOLLYE D ("the MISS MOLLYE D" or "the Vessel"), an inland pushboat owned pro hac vice and operated by Deloach Marine Services, LLC ("Petitioner" or "Deloach"), and her tow of six barges allided with a roadway bridge on Louisiana Highway 182 ("the Bayou Ramos Bridge" or "the Bridge") located in St. Mary Parish.[1] While Deloach admits that its mate Joseph M. Giordano, Jr. ("Giordano") negligently caused or allowed the MISS MOLLYE D to allide with the Bridge, it argues that this was an isolated act of negligence or error of navigation about which it had no privity or knowledge. Deloach argues that its vessel and crew, including Giordano, were well-trained and seaworthy and, in any event, Deloach had no privity or knowledge of any negligent act or allegedly unseaworthy condition, such that it is entitled to limit its liability to the value of the Vessel and pending freight.

Claimants, the State of Louisiana, through its Department of Transportation and Development ("DOTD") (the owner of the Bayou Ramos Bridge) and St. Mary Parish Water and Sewerage Commission # 1 ("SMPWSC") (the owner of certain equipment on the Bridge) primarily contend that the allision was the result of the gross incompetence and negligence of the Vessel's mate and the consequent unseaworthiness of the MISS MOLLYE D, about which Deloach knew or which it reasonably could have discovered, with the result being that Deloach's demand for limitation of liability should be denied.

After carefully viewing, reviewing, and evaluating the evidence and the briefing of the parties,[2] the Court finds: first, that the mate Joseph M. Giordano, Jr., was not merely negligent and the victim of a momentary loss of situational awareness, as Deloach contends, but rather was an incompetent mariner, as demonstrated by his lack of sufficient training in the Rose Point

---

[1] Joint Trial Stipulations, Doc. 88 at 1–2, ¶¶ 1–3, 11, 15.
[2] Pet. Brief, Doc. 108; Cl. Brief, Doc. 109; Pet. Reply, Doc. 110; Cl. Reply, Doc. 111.

navigation system and a series of serious negligent acts and omissions before, during, and after the allision; second, that Giordano's incompetence rendered the MISS MOLLYE D unseaworthy; third, that the unseaworthy condition of the Vessel (i.e., the incompetent crewmember) was a proximate cause of the allision; fourth, that Deloach had privity and knowledge of the unseaworthy condition by virtue of its personal participation in bringing about the unseaworthy condition, *viz.*, by failing to sufficiently train Giordano in the use of a navigational device (Rose Point) which he was expected to use and which, had he used it properly, would have prevented the allision; fifth, that Deloach had privity and knowledge of the unseaworthy condition because it could have, with the exercise of reasonable diligence, discovered Giordano's incompetence prior to the allision; and sixth, that because Deloach had privity and knowledge of the unseaworthy condition, it is not entitled to limit its liability.

## II.     PROCEDURAL HISTORY

Deloach invoked this Court's admiralty jurisdiction by filing an action pursuant to the Limitation of Liability Act, 46 U.S.C. § 30501 *et seq.*[3] DOTD and SMPWSC timely filed answers and claims in the limitation action for property damage resulting from the allision.[4]

Petitioner Deloach was owner pro hac vice and operator of the MISS MOLLYE D, which struck the Bridge on December 23, 2021.[5] Deloach also employed her crew.[6]

Claimant DOTD owns the Bridge, which is located along the northern bank of the Gulf Intercoastal Waterway, outside of the main channel.[7] The Bridge supports vehicular traffic and has a frame structure that supports various utilities, including a water line owned by SMPWSC.[8]

---

[3] Complaint for Exoneration From or Limitation of Liability, Doc. 1.
[4] Docs. 12, 13.
[5] Doc. 1 at 2, ¶ 3; Doc. 12 at 3, ¶ 3; Doc. 13 at 3, ¶ 3; Doc. 88 at 1, ¶¶ 1–2.
[6] Doc. 88 at 2, ¶ 11.
[7] Doc. 109 at 3, ¶ II.1.
[8] *Id.*

DOTD seeks compensation for property damage to the Bridge allegedly suffered in the allision.[9] Claimant SMPWSC seeks compensation for damage allegedly done to its water line.[10]

Deloach posted a Letter of Undertaking ("LOU") for the value of the Vessel, its flotilla, and pending freight in the amount of $677,180.00.[11] Under the LOU, the P&I Club, British Marine/QBE UK Limited, also undertook the sum of prejudgment interest in the amount of 6% per annum.[12] The parties stipulated to these values.[13]

Deloach stipulated to its liability "for the errors in navigation by the mate [Joseph M. Giordano, Jr.] and the allision by the MISS MOLLYE D and her tow with the Bayou Ramos Bridge on December 23, 2021."[14] The Court notes that Deloach's stipulation of liability made at the beginning of trial was not so narrow.[15]

The matter was bifurcated into two trials: one as to Deloach's entitlement to limit its liability under the Limitation of Liability Act, the other as to the amount of damages suffered by the Claimants.[16] The trial on limitation of liability occurred on October 2–4, 2024.[17] This ruling concerns only the trial on limitation of liability.

## III.    SUMMARY OF PARTIES' POSITIONS

The parties stipulated that the Vessel "was in compliance with" the applicable inspection laws, rules, and regulations as of the date of the incident.[18] They agree that Giordano had the requisite license to be at the helm of the Vessel at the time of the allision, namely a "Merchant

---

[9] *Id.*
[10] *Id.* at 4, ¶ II.2.
[11] Joint Exhibit 6.
[12] *Id.*
[13] Doc. 88 at 3, ¶¶ 19–20.
[14] Doc. 108 at 25, ¶ 5.
[15] *See* Doc. 102 at 19 ("So it's a stipulation of liability, pure and simple."); *see also* Doc. 109 at 3, ¶ I.3.
[16] Doc. 109 at 3, ¶ I.3.
[17] The trial transcript is found at Docs. 100, 101, 102, 103, 105.
[18] Doc. 88 at 2, ¶ 13.

Mariner credential issued by the [U.S.] Coast Guard as a Mate of Towing Vessels Upon the Great Lakes, Inland Waters and Western Rivers."[19] The parties also agree that Giordano was negligent in causing the allision.[20] However, they vehemently disagree about Giordano's general competence, whether any alleged incompetence rendered the Vessel unseaworthy, and whether Deloach knew or, with reasonable diligence, could have discovered the alleged unseaworthy condition.

Deloach argues that Giordano was generally competent and well qualified, as evidenced not only by his training, experience, and licensure but also by the lack of any previous complaints about his performance.[21] It contends that the allision was caused by an isolated "mistake of navigation" created by a momentary "loss of situational awareness," which Deloach could not possibly have anticipated, known about, or prevented.[22] Thus, argues Deloach, it is entitled to limit its liability.

Claimants argue that, despite being properly licensed, Giordano's lack of experience piloting vessels without supervision (i.e., while using his mate's license); his prior allision with another vessel in the same waterway; Deloach's negligent failure to adequately train him in the Rose Point navigation system;[23] and his succession of errors before, during, and after the allision all reveal that he was grossly incompetent.[24] This rendered the Vessel unseaworthy, and with

---

[19] *Id.* at 2, ¶ 14.
[20] Doc. 108 at 25, ¶ 5; *see also* Doc. 102 at 19 ("So it's a stipulation of liability, pure and simple."); Doc. 109 at 3, ¶ I.3.
[21] *See, e.g.*, Doc. 108 at 1, 4–12, ¶¶ 15–50.
[22] *Id.* at 1; *see also id.* at 19, ¶¶ 90–91.
[23] Deloach refers to this system as "the Rosepoint navigation system." (Doc. 108 at 8, ¶ 30.) Claimants refer to it both as "Rosepoint" and "RosePoint." (Doc. 109 at 5, ¶ 5.) According to the product's website, it is "Rose Point." *The New Rose Point ECS*, https://www.rosepoint.com/ (last visited Mar. 28, 2026). The Court will use "Rose Point," except when quoting the parties' briefs.
[24] *See* Docs. 109, 111.

reasonable diligence Deloach could have discovered same.[25] Thus, conclude Claimants, Deloach is not entitled to limit its liability.

## IV.    FACTUAL BACKGROUND & FACTUAL DISPUTES

### A.  The M/V MISS MOLLYE D

At all relevant times, Deloach was both owner pro hac vice and operator of the Vessel.[26] The Vessel was an 86-foot-long towing vessel constructed in 1961,[27] bearing vessel number 286204.[28] The MISS MOLLYE D was issued its Certificate of Inspection on August 17, 2021, by a Third Party Organization ("TPO") recognized by the Coast Guard. The parties stipulated that, as of the date of the incident—December 23, 2021—the Vessel was in compliance with all applicable inspections, laws, rules, and regulations.[29]

The Vessel was equipped with a variety of navigational devices, including radar,[30] VHF radios with weather bands,[31] a swing meter,[32] and a Rose Point electronic navigation charting software system. Rose Point included AIS,[33] which automatically broadcasted and received real-time data, such as vessel name, position, speed over ground, and course over ground.[34] Rose Point also included a vessel "ghost predictor" feature, which allowed the user to predict the Vessel's future position if her course and speed remained the same.[35] Other aspects of the Rose Point system will be discussed in connection with liability issues. While sitting at the helm of the MISS

---

[25] *See* Docs. 109, 111.
[26] Doc. 1 at 3, ¶ 3; Doc. 12 at 3, ¶ 3; Doc. 13 at 3, ¶ 3; Uniform Pre-Trial Order, Doc. 65 at 7–8; Doc. 88 at 1–2, ¶¶ 2, 11.
[27] Joint Exhibits 21, 59.
[28] Joint Exhibit 59.
[29] Doc. 102 at 46–48 (Deloach); Doc. 88 at 2, ¶ 13; Joint Exhibit 59.
[30] Doc. 105 at 100–01 (Giordano).
[31] *Id.* at 32 (Giordano).
[32] *Id.* at 99 (Giordano).
[33] *Id.* at 101 (Giordano).
[34] *Id.* at 56, 105–08 (Giordano).
[35] *Id.* at 104–05 (Giordano).

MOLLYE D, a seaman could easily look from the window to the right in order to see the Rose Point screen, radar, and swing meter.[36]



[37]

The Vessel was also equipped with a CCTV camera pointing toward the bow and the tow, which recorded the video shown at trial.[38] Indeed, the radar, VHF, CCTV, and Rose Point data from the morning of the allision were all recorded.[39] There is a time difference of approximately 55 minutes and 46 seconds between the timestamp of the Rose Point data and the CCTV/radar data.[40] The Court will usually refer to the Rose Point time, as it is the one most often used by the parties and appears to be the correct one.

### B.  Joseph M. Giordano, Jr. – Employment with Deloach

The evidence regarding Giordano's times of employment with Deloach is somewhat confusing. Reconciling the records and the testimony, it appears that Giordano was employed by

---

[36] *Id.* at 102 (Giordano).
[37] Joint Exhibit 101.
[38] *See* Joint Exhibit 48.
[39] *See* Joint Exhibits 47–49.
[40] Doc. 65 at 7, ¶ 10; Doc. 88 at 2, ¶ 10.

Deloach on four separate occasions: (1) from June 22, 2010,[41] until March 2012;[42] (2) from April 2, 2015, until September 2, 2016, when he was fired for "no comm" (presumably, "no communication");[43] (3) from December 29, 2016, until either October 2020, when he was laid off due to a work slow-down,[44] or December 8, 2020, when he was fired ("Terminated unable to get ahold of Joe since he left work");[45] and (4) from March 23, 2021,[46] until the date of the accident in question, December 23, 2021.[47]

The day after the allision, Giordano quit his employment with Deloach and never returned to work for Deloach or anyone else in the maritime industry.[48] After the Coast Guard launched an investigation into the allision in question, Giordano surrendered his pilot's license.[49]

### C. Joseph M. Giordano, Jr. – Training with Deloach

Giordano received the entirety of his maritime training and experience while working for Deloach during his four periods of employment.[50] Giordano's maritime education and training were covered in great detail by Deloach during the trial and in briefing.[51] With the exception of the amount of time which Giordano spent behind the wheel of a vessel as a mate (discussed elsewhere in this ruling) and the level of training which he got on Rose Point (also covered elsewhere), this evidence is largely uncontested and will not be repeated here.

---

[41] Doc. 105 at 9 (Giordano); Joint Exhibit 25 at 358. The Court will use the appropriate Bates stamped page numbers (e.g., "DMS000358") when pin-citing exhibits.

[42] Doc. 105 at 22 (Giordano).

[43] Joint Exhibit 45 at 1253; *see also* Doc. 100 at 46 (Deloach) (After initially testifying that Giordano had never been fired, Zeland David Deloach, Deloach's principal, admitted that Giordano was fired twice from his employment at Deloach.).

[44] Doc. 105 at 85 (Giordano); Joint Exhibit 45 at 1253.

[45] Joint Exhibit 45 at 1253; Joint Exhibit 25 at 413 (where Giordano fails to mention either termination).

[46] Doc. 105 at 25–26 (Giordano); Joint Exhibit 25 at 413 (application dated 3/10/21); *id.* at 431 (showing pre-voyage orientation); *see also id.* at 412–30.

[47] Doc. 101 at 29–30 (Giordano).

[48] *Id.*

[49] *Id.* at 30–31 (Giordano).

[50] Doc. 105 at 79–81 (Giordano); *see also id.* at 9 (Giordano); Joint Exhibit 25.

[51] *See, e.g.,* Doc. 105 at 7–42 (Giordano); Doc. 108 at 5–11, ¶¶ 17–22, 25–36, 39–42, 44–45 (citing to the record).

The evidence shows that, for each of the positions held by Giordano as he worked his way up the employment ladder at Deloach—from deckhand level 1 to mate/pilot—Giordano got the training and experience and passed the tests required to obtain the licenses which he held. For instance, in December 2017, Giordano underwent 108 hours of training to become a "steersman" (sometimes called an "apprentice mate").[52] A steersman or apprentice mate can steer the vessel, but only under the supervision of a master.[53] Giordano finished the steersman program in September 2020.[54] He then underwent a Towing Officer Assessment Record ("TOAR"),[55] as required of all steersmen applying for a mate/pilot's license.[56] Obtaining a TOAR and steersman license and getting the required sea time are minimum Coast Guard requirements for applying for a mate/pilot's license.[57]

Deloach emphasizes that Giordano served a total of 323.5 days as a licensed steersman/apprentice on various vessels, including 46.5 days on the MISS MOLLYE D from May to June 2020.[58] This service would have been under the supervision of a licensed Master of Towing, who would have watched Giordano operate the Vessel and its various wheelhouse devices.[59]

Regarding Giordano's specific training, experience, and abilities with Rose Point, Deloach argues that "[w]hile serving as an Apprentice Mate/Steersman, Mr. Giordano operated the towing vessels of the MISS MOLLYE D, CITY OF PORT ALLEN, ELISSA, BILL MILLER, HARRY BRINDELL, VANPORT, CHRISTY, and SALLIE ANN which were all equipped with the

---

[52] Doc. 105 at 29–30, 80 (Giordano).
[53] *Id.* at 24–25 (Giordano).
[54] *Id.* at 83–84 (Giordano).
[55] *Id.* at 41 (Giordano).
[56] Doc. 101 at 74 (Cheramie).
[57] Doc. 100 at 148 (Moore).
[58] Doc. 108 at 7, ¶ 25.
[59] Doc. 102 at 134–39 (Deloach); Doc. 105 at 32–33, 36–37 (Giordano); Joint Exhibit 25 at 577.

Rosepoint navigation system. In addition, he also attended a one-day classroom program on February 4, 2020 conducted at Deloach Marine Service for training on Rosepoint and AIS. This classroom training on Rosepoint included videos."[60] According to Deloach, during Claimants' cross examination of Giordano at trial, Giordano demonstrated "his knowledge of how to use each of the navigational aids and particularly Rosepoint."[61]

Claimants, on the other hand, argue that Zeland David Deloach, Deloach's principal, admitted that it was his job to make sure that Giordano was trained properly.[62] Giordano testified that his training on Rose Point consisted of on-the-job learning and possibly watching a video, although he could not recall the video's length or substance.[63] According to Claimants, Giordano testified that he was still learning the weather feature of the Rose Point software at the time of the allision.[64] While Claimants concede that Giordano obtained a certificate in Rose Point, they argue that the certificate reflects only that Giordano knew how to input the size of his vessel's tow on AIS, such that a representative depiction of his tow size would appear on the screen, which is a fraction of the software's capabilities.[65]

Claimants contend that, if it had been used properly, "RosePoint (including the ghost predictor that predicted the Vessel would hit the Bridge if course and speed were not changed)" would have averted the allision; but because of Giordano's lack of proper training and experience, he did not use Rose Point properly, resulting in the allision.[66]

---

[60] Doc. 108 at 8, ¶ 30 (citing Doc. 102 at 146–49 (Deloach); Joint Exhibit 25 at 631–73).
[61] *Id.* at 16, ¶ 72 (citing Doc. 101 at 4–9, 56–57 (Giordano); Doc. 105 at 99–110 (Giordano); Joint Exhibit 101 at 2); *see also id.* at 16, ¶ 73 (citing Doc. 105 at 104–09 (Giordano)) (arguing that "a great deal of the cross examination of Mr. Giordano focused on his knowledge and the settings as well as the video recording from the Rosepoint for the voyage the morning of December 23, 2021").
[62] Doc. 109 at 26, ¶ 36 (citing Doc. 100 at 42–43 (Deloach)).
[63] *Id.* (presumably, intending to cite Doc. 105 at 109 (Giordano)). Going forward, where it appears to the Court that the parties have inadvertently cited the wrong record document, the Court will simply substitute the correct one.
[64] *Id.* (citing Doc. 105 at 109 (Giordano)).
[65] *Id.* (citing Doc. 100 at 143–44 (Moore)).
[66] *Id.* (citing Doc. 100 at 112–13 (Moore)).

### D. Joseph M. Giordano, Jr. – On-the-Job Experience with Deloach

During his first period of employment (June 2010 to March 2012), Giordano started as a deckhand level 1 ("the greenest deckhand there is") and progressed to a deckhand level 6 ("lead deckhand").[67] From April 2012 to March 2015, Giordano left Deloach and worked at a railroad company as a conductor.[68]

After returning to Deloach in 2015, Giordano applied for a position as a steersman/apprentice mate and eventually obtained that license on March 19, 2019.[69] He began to get paid as a steersman/apprentice mate on May 1, 2019,[70] but during his first 120 days working as a steersman, he was still working as a deckhand as well and getting steersman time when available.[71] Deloach argues that, even while Giordano was acting as a deckhand during this time period, Giordano would also serve in the wheelhouse as a steersman/apprentice mate, under the supervision of a licensed mate or master.[72]

On September 21, 2020, Giordano applied for a mate/pilot's license.[73] He received that license some time after November 24, 2020, and before March 11, 2021.[74] Unlike the steersman/apprentice mate's license, the mate/pilot's license allowed him to be at the wheel of the vessel alone and without supervision.[75]

Although Giordano had his mate/pilot's license at or about the time when Deloach re-hired him in March 2021, Giordano was hired as a deckhand because there were no mate/pilot positions

---

[67] Doc. 105 at 12, 17–18, 23 (Giordano).
[68] *Id.* at 22–23 (Giordano).
[69] *Id.* at 80 (Giordano).
[70] *Id.* at 81 (Giordano); Joint Exhibit 43 at 624.
[71] Doc. 105 at 82 (Giordano).
[72] Doc. 108 at 10, ¶ 39 (citing Doc. 105 at 73–74 (Giordano); Joint Exhibit 27 at 1259).
[73] Doc. 105 at 73–74, 81–84 (Giordano); Joint Exhibit 43 at 622.
[74] Doc. 105 at 85 (Giordano).
[75] *See id.* at 97 (Giordano) (noting that the first time when Giordano was able to "stand his own watch" as a pilot was August 5, 2021).

available at that time.[76] At trial, Giordano testified that, while a deckhand during this timeframe, he did steer some of Deloach's towing vessels.[77] However, Claimants argue that, when confronted with the NTSB interview notes, Giordano testified that he told the NTSB that he never steered a vessel during this time.[78] Claimants argue that, according to Deloach's own records, the first time Giordano piloted a vessel standing his own watch was around August 5, 2021.[79] Afterwards, Giordano returned to being a deckhand for about the next two months.[80]

Claimants further maintain that Giordano only began regularly working as a pilot in October 2021, just two months before the allision.[81] On the date of the allision—December 23, 2021—Giordano had stood his own navigational watch for less than 50 days.[82] He had worked only one full hitch.[83]

According to Deloach, Giordano had his first opportunity to serve as a mate in the wheelhouse in late-July 2021 on the M/V BILL MILLER.[84] This was for one day.[85] The next occasion when Giordano served as a mate alone in the wheelhouse, says Deloach, was in late-September 2021 and then again in early-October 2021 on the M/V CITY OF PORT ALLEN.[86] This was a total of 6.5 days serving as mate.[87]

---

[76] *Id.* at 88–91 (Giordano) (discussing Joint Exhibit 36).

[77] *Id.* at 90–91 (Giordano); *see also* Contested Exhibit 95 at 2.

[78] Doc. 109 at 24, ¶ 33 (citing Doc. 105 at 95 (Giordano)). The Court permitted the NTSB records to be used for impeachment on this issue. (Doc. 105 at 91–93 (Giordano).)

[79] Doc. 109 at 22–24, ¶ 33 (citing Doc. 105 at 97 (Giordano)).

[80] *Id.* (citing Doc. 105 at 97–98 (Giordano)).

[81] *Id.* (citing Doc. 105 at 98 (Giordano)).

[82] *Id.* (citing Joint Exhibit 27; Doc. 103 at 38 (Baumgartner); Doc. 101 at 99 (Cheramie); Doc. 105 at 71–77 (Giordano)).

[83] *Id.* (citing Doc. 101 at 99 (Cheramie); Joint Exhibit 46).

[84] Doc. 108 at 10, ¶ 40 (citing Doc. 105 at 74 (Giordano); Joint Exhibit 27 at 1259).

[85] *Id.*

[86] *Id.* at 10, ¶ 41 (citing Doc. 105 at 75, 98 (Giordano)).

[87] *Id.*

Deloach maintains that, beginning on or about October 28, 2021, Giordano was assigned aboard the MISS MOLLYE D to serve his own watches in the wheelhouse as a licensed mate.[88] He continued to serve as mate on hitches of 28 days on and 14 days off the Vessel until the December 23, 2021, allision.[89] During this period from October 28 until December 23, 2021, Giordano served as mate for over 45 days aboard the MISS MOLLYE D, standing wheelhouse watches for 12 hours in every 24-hour time period.[90] This work was performed in six-hour watches where he would be at the helm on the "back watch" from midnight to 0600 hours and then from noon until 1800 hours each of the days on which he served aboard the MISS MOLLYE D.[91]

### E.   Joseph M. Giordano, Jr. – Prior Experience with Waterway & Prior Accident

Giordano navigated this route as steersman or mate on one or two occasions prior to the one on which the allision occurred.[92] All parties agree that, on one of those occasions, Giordano had some level of involvement in another allision.[93] However, the parties disagree about the specifics and significance of Giordano's prior experience with the specific waterway where the allision occurred, as well as the relevance of the prior accident.[94]

Deloach contends that, while Giordano had been on that waterway only a few times before and was involved in an incident on one of those, the previous incident was not Giordano's fault, and Deloach had no reason to take action against him.[95] More specifically, according to Deloach, the previous voyage at issue occurred in 2018 or 2019, while Giordano was being observed and

---

[88] *Id.* at 10, ¶ 42.
[89] *Id.*
[90] *Id.*
[91] *Id.* (citing Doc. 105 at 75–78 (Giordano); Joint Exhibit 27 at 1259).
[92] Doc. 105 at 56, 112–13 (Giordano).
[93] Doc. 108 at 6–7, ¶¶ 23–24; Doc. 109 at 25–26, ¶ 35.
[94] Doc. 108 at 6–7, ¶¶ 23–24; Doc. 109 at 25–26, ¶ 35.
[95] Doc. 110 at 5.

trained by Master Butch Polansky.[96] The vessel was traveling westbound in the same area of the Intercoastal Waterway near Morgan City where the allision at issue here occurred.[97] Giordano was at the wheel but left the wheelhouse and went below to use the bathroom.[98] Deloach argues that, upon Giordano's return to the wheelhouse, Polansky made him aware that Polansky had entered into a passing arrangement with an eastbound vessel.[99] This passage was to take place in a bend with a moored vessel on the bank.[100] Polansky gave the wheel back to Giordano.[101]

Deloach admits that, after re-taking the wheel, Giordano got "too wide" in the bend.[102] Before any contact was made with the moored vessel, Polansky retook control of the vessel, but it still came into contact with the moored vessel.[103] According to Deloach, Polansky was taken off the vessel, but Giordano was not disciplined or sanctioned in any way.[104] Instead, a policy change was made at Deloach that a master who makes a passing arrangement cannot "pass the sticks" to an apprentice mate.[105] In addition, the wheelman who made the passing arrangement was required to complete the passing, and no meetings were to take place in a bend.[106] Zeland David Deloach confirmed this testimony of Giordano.[107]

Claimants, on the other hand, argue that the previous incident was at least in part Giordano's fault, is evidence of his incompetence, and should have provided warning to Deloach regarding his incompetence and need for additional training.[108] They emphasize that he had

---

[96] Doc. 108 at 6–7, ¶¶ 23–24.
[97] *Id.*
[98] *Id.*
[99] *Id.*
[100] *Id.* at 6, ¶ 23 (citing Doc. 105 at 56–57 (Giordano)).
[101] *Id.* at 6–7, ¶¶ 23–24; Doc. 110 at 5.
[102] Doc. 108 at 6–7, ¶ 24.
[103] *Id.*
[104] *Id.*
[105] *Id.*
[106] *Id.*
[107] *Id.* (citing Doc. 105 at 57–58 (Giordano); Doc. 101 at 59–60 (Giordano); Doc. 100 at 53–54, 89–91 (Deloach)).
[108] Doc. 109 at 25–26, ¶ 35.

navigated the Bayou Boeuf stretch of the Intercoastal Waterway only twice before the morning of the allision,[109] and during one of those transits he allided with a moored vessel[110] in Sugarhouse Bend,[111] which was the bend that he was nervous about on the night of the December 23, 2021, allision.[112] Claimants note that, when Giordano testified at trial about the prior accident, he blamed another wheelsman for making improper passing arrangements, allegedly setting Giordano up for failure.[113] However, during Giordano's deposition, say Claimants, he took ownership of the accident and made no mention of another wheelsman being responsible.[114] Similarly, in his interview with the NTSB (the admissibility of which is under review and has been briefed in Docs. 97 and 98), he did not place blame on the other wheelsman for the accident.[115]

Given his previous allision, argue Claimants, Giordano successfully navigated this waterway on his own watch only one of three times—a 33% success rate.[116] Giordano admitted that he did not have a lot of experience on this route.[117] Zeland David Deloach testified that he knew about the prior accident and was involved in its investigation.[118]

### F.  Trip of MISS MOLLYE D from Departure Until Bayou Boeuf Locks

The voyage began in the San Jacinto River near Houston, Texas, on December 19, 2021.[119] It was originally scheduled to begin on December 18, but because of foul weather, the departure did not occur until the early evening of December 19.[120] The MISS MOLLYE D was pushing a "six-

---

[109] *Id.* (citing Doc. 105 at 56, 112–13 (Giordano)).
[110] *Id.* (citing Doc. 105 at 57, 113 (Giordano)).
[111] *Id.* (citing Doc. 101 at 100 (Cheramie); Contested Exhibit 95).
[112] *Id.* (citing Doc. 101 at 28 (Giordano)).
[113] *Id.* (citing Doc. 105 at 57–58 (Giordano)).
[114] *Id.* (citing Doc. 100 at 181–83 (Ryan)).
[115] *Id.* (citing Contested Exhibit 95). The Court notes that, consistent with its ruling on *Petitioner-In-Limitation's Motion* in Limine *to Exclude NTSB Report* (Doc. 69; *see also* Docs. 71, 78, 97, 98), the Court has not considered the contents of the NTSB report in reaching its decision.
[116] Doc. 109 at 25–26, ¶ 35 (citing Doc. 105 at 112–13 (Giordano)).
[117] *Id.* (citing Doc. 105 at 112–13 (Giordano)).
[118] *Id.* (citing Doc. 100 at 52–53 (Deloach)).
[119] Doc. 105 at 44–46 (Giordano).
[120] *Id.*

pack" of barges.[121] Of the six hopper barges, two were loaded, and the remaining four were empty.[122] The total length of the vessel and tow was over 600 feet.[123]

The Vessel was crewed by licensed master of towing David Boudreaux, licensed mate of towing Joseph M. Giordano, Jr., licensed deckhand/apprentice mate Marvin Robb, licensed deckhand/tankerman PIC Matthew Parker, and deckhand Anthony Cashio. All were employees of Deloach.[124] Throughout the voyage, Giordano worked the "back watch," from midnight to 0600 hours and noon hours to 1800 hours. The deckhand assigned to work with him was Anthony Cashio. The master, Boudreaux, worked the "front watch," from 0600 hours to noon and then 1800 hours to midnight.[125]

From San Jacinto, the Vessel traveled east on the Intercoastal Waterway.[126] On December 22, 2021, at 1930 hours—about four hours before the allision—the Vessel arrived at the Bayou Boeuf Locks near Morgan City and waited its turn to enter the locks.[127] At midnight, while still awaiting permission to enter the locks, Boudreaux was relieved at the wheel by Giordano along with his back watch deckhand, Cashio.[128] When Giordano and Cashio began their watch, Boudreaux and Parker went to sleep below deck.[129] Lead deckhand Robb remained on deck to assist in transiting the locks.[130] From December 19 until approximately twenty minutes after the

---

[121] Doc. 88 at 1–2, ¶¶ 3, 15.

[122] Doc. 105 at 111 (Giordano).

[123] *Id.*

[124] Joint Exhibits 7, 29, 30, 31, 42; Doc. 65 at 8; Doc. 105 at 7–9 (Giordano); Doc. 88 at 2, ¶¶ 11, 14; Doc. 103 at 121 (Boudreaux); Doc. 100 at 6, 9 (Cashio).

[125] Doc. 105 at 45, 50 (Giordano); Doc. 100 at 8–9, 11–12 (Cashio); Doc. 103 at 125–26 (Boudreaux).

[126] Joint Exhibit 104; Doc. 105 at 77, 112 (Giordano).

[127] Joint Exhibit 7 at 8 (12/22/21 entry at 1930 hours); Joint Exhibit 8 at 19 (12/22/21 entry at 1930 hours); Joint Exhibit 47; Doc. 105 at 51–52 (Giordano).

[128] *See* Joint Exhibit 7 at 8 (12/22/21 entry at 1930 hours); Joint Exhibit 8 at 19 (12/22/21 entry at 1930 hours); Doc. 105 at 51–52 (Giordano); Doc. 103 at 125–26 (Boudreaux).

[129] Doc. 103 at 128–29 (Boudreaux); Doc. 100 at 11–12 (Cashio).

[130] Doc. 105 at 110 (Giordano); Doc. 100 at 25 (Cashio).

MISS MOLLYE D left the Bayou Boeuf Locks in the early morning hours of December 23, the voyage was uneventful.[131] About this, there is no disagreement among the parties.

### G. Trip of MISS MOLLYE D from Bayou Boeuf Locks Until Moments Prior to Allision

The MISS MOLLYE D entered the Bayou Boeuf Locks at approximately 0150 hours on December 23 and departed the locks between 0215 hours and 0245 hours.[132] Once through the locks, deckhand Robb returned to bed.[133] Giordano remained at the wheel of the Vessel, which was heading eastbound on the Bayou Boeuf portion of the Intercoastal Waterway.[134] Deckhand Cashio remained on watch. This was the first shift that Cashio had worked on his own; prior to this shift, a senior deckhand would have been on watch with him.[135]

Giordano directed Cashio to pump the bilge in the engine room below deck, where Cashio stayed for two to three hours until after the allision.[136] There were no windows in the engine room, and Cashio was unable to observe what was happening above deck.[137]

At 0306 hours—some 20 minutes after leaving the locks—and for the next seven to eight minutes, Giordano caused or allowed the MISS MOLLYE D to come to a virtual standstill, blocking the channel; the head of the Vessel's tow was near the north bank, and her stern rested near the south bank.[138] What caused Giordano to do this and the significance of his actions and inactions during this time are points of serious disagreement between Deloach and Claimants.

---

[131] *See* Joint Exhibit 7.

[132] Doc. 105 at 52–53 (Giordano); *see* Joint Exhibit 7 at 10.

[133] Doc. 100 at 25 (Cashio).

[134] Joint Exhibit 7 at 10; Doc. 105 at 47, 51–52 (Giordano).

[135] Doc. 100 at 11 (Cashio).

[136] *Id.* at 12 (Cashio).

[137] *See id.* at 16–17 (Cashio).

[138] Doc. 105 at 113–27 (Giordano). At 3:06:18, the MISS MOLLYE D was "pretty much stopped" with the Vessel's stern on the south bank of the Intercoastal Canal and the head of its tow on the north bank. (Doc. 105 at 113–14 (Giordano).) It remained in that position until 3:13:35, when it started to move off the bank and continue its voyage. (*Id.* at 126–27 (Giordano).)

According to Deloach, after leaving the Bayou Boeuf Locks, Giordano was concerned with the potential of patchy fog ahead.[139] As a result, during this time, he listened to the VHF radio communications by other vessel operators and also looked at the weather information provided on the Rose Point computer screen.[140] Deloach maintains that, "[i]n direct response to cross examination on his ability to navigate that morning, Mr. Giordano testified he was confident in his ability and competence to navigate but nervous due to the potential of patchy fog and the fact he had not navigated that route very often."[141]

Deloach argues that it was proper and justified for Giordano to "loiter" the Vessel while he explored his weather concerns[142] and that "laying into [a] bank is a normal way in the towboat industry to hold your position, to keep yourself out of the way of other vessels," so it "is not necessarily a grounding."[143]

As mentioned above, an important feature of the disagreement regarding Giordano's conduct during this time as well as the minutes right before the allision itself is his knowledge, proficiency, use, misuse, or non-use of Rose Point. Deloach explains that "[t]he Rosepoint navigation charting system allows for the wheelman to set the scale or range for viewing the area in which he is navigating."[144] Deloach contends that, on the morning of December 23, Giordano chose to use a "split screen" setting where the closer range or scale is on the left half of the Rose Point screen while a further range or scale is on the right half of the screen.[145]

---

[139] Doc. 108 at 14–15, ¶ 66.
[140] *Id.* (citing Doc. 101 at 58 (Giordano); Doc. 105 at 63, 114 (Giordano)).
[141] *Id.* at 16, ¶ 74 (citing Doc. 101 at 29, 37 (Giordano)).
[142] *See* Doc. 103 at 32 (Baumgartner).
[143] *Id.* at 33–34 (Baumgartner).
[144] Doc. 108 at 15, ¶ 67.
[145] *Id.* (citing Doc. 105 at 55 (Giordano)).

Rose Point also contains a weather feature, which includes a drop-down menu to see a prediction of the weather.[146] According to Deloach, when a mariner accesses the weather feature on Rose Point while using "split screen" scales, the weather "drop down" completely blocks the left side, or closer scale, of the chart system.[147]

Claimants paint a very different picture. According to Claimants, at 0306 hours and for a period of approximately eight minutes thereafter, Giordano allowed the Vessel and her tow to become and remain sideways, blocking the channel.[148] This position, they contend, should have been visible to Giordano on the Rose Point software.[149] Claimants point the Court to the testimony of their expert Captain Carl Moore that Giordano violated Inland Navigation Rule 9 because he failed to keep the Vessel to the outer starboard limit of the narrow channel during this time.[150] Moore said that, in his entire career, he had never seen a vessel block the channel as Giordano did for this period of time.[151] According to Claimants' navigation expert Captain Maurice Ryan, this was highly unusual—as "commonplace as seeing a car parked sideways on a one lane road."[152]

Although Giordano testified that he could not remember exactly what he was doing during this time,[153] say Claimants, he suggested that he could have been monitoring the weather feature on Rose Point because he had heard reports of patchy fog up ahead.[154] Claimants emphasize that the Rose Point weather feature does not show Doppler radar like one might see on the weather

---

[146] *Id.* at 15, ¶ 69.

[147] *Id.* (citing Doc. 105 at 54–56, 59 (Giordano); Doc. 101 at 55–56 (Giordano)). Deloach states that the Rose Point weather "drop down" blocked the *right* side of the screen. The Court assumes that Deloach meant to say that weather "drop down" blocked the *left* side of the screen. (*See, e.g.*, Doc. 101 at 55 (Giordano).)

[148] Doc. 109 at 7–8, ¶ 10 (citing Doc. 105 at 113–14 (Giordano)).

[149] *Id.* (citing Joint Exhibit 47 at 03:06:18).

[150] *Id.* at 11–12, ¶ 14 (citing Doc. 100 at 99–100 (Moore)). Rule 9 of the Inland Navigation Rules states that a vessel "shall keep as near to the outer limit of the channel or fairway which lies on her starboard side as is safe and practicable." 33 C.F.R. § 83.09(a)(i).

[151] Doc. 109 at 11–12, ¶ 14 (citing Doc. 100 at 100 (Moore)).

[152] *Id.* (citing Doc. 100 at 178 (Ryan)).

[153] *Id.* at 8, ¶ 10 (citing Doc. 105 at 116 (Giordano)).

[154] *Id.* (citing Doc. 105 at 116 (Giordano)).

portion of the local TV news; rather, the weather information presents as a written description.[155] The weather feature does not show a diagram or map of where fog patches are located.[156]

Claimants note that Moore testified that it should take just seconds to push the weather icon on Rose Point, approximately 15 seconds to scroll down to the portion of the report on Lake Charles, and about 30 seconds to read the weather report word-for-word.[157] Thus, according to Claimants, Giordano's needless but continuous use of the Rose Point weather feature here (and later) demonstrates his incompetence and lack of proper training.

At around 03:13:25, Giordano straightened the Vessel in the channel and began making way eastbound again.[158]

### H. The Allision

At approximately 03:25:23 (4:21 on the CCTV timestamp)—some 12 minutes after getting underway again—the MISS MOLLYE D struck the Bayou Ramos Bridge.[159] As mentioned earlier, the Bridge is located on the Bayou Boeuf portion of the Intercoastal Waterway,[160] on LA Route 182 between Morgan City and Amelia, Louisiana, and it supports vehicular traffic. It crosses Bayou Ramos at its intersection with Bayou Boeuf.[161]

At approximately 0322 hours—some eight to nine minutes after resuming travel eastward and some three minutes before the allision—the Vessel began veering severely to port, towards the Bayou Ramos Bridge.[162] The veer to port can be seen on the Vessel's radar.[163] At 3:22:40, the

---

[155] *Id.* at 9, ¶ 10 (citing Doc. 101 at 56 (Giordano)).

[156] *Id.* (citing Doc. 101 at 134 (Cheramie)).

[157] *Id.* (citing Doc. 100 at 150–51 (Moore)).

[158] *See, e.g.*, Joint Exhibit 47.

[159] Doc. 101 at 7–8 (Giordano); *see also* Joint Exhibit 50 (MISS MOLLYE D Combination Rose Point/CCTV/Radar/VHF Video Playback from 12/23/21); Doc. 88 at 1, ¶ 1 ("In the early morning of December 23, 2021, the MISS MOLLYE D and its tow allided with the Bayou Ramos Bridge.").

[160] Doc. 105 at 45, 113, 129 (Giordano); Joint Exhibits 21, 47.

[161] Doc. 109 at 6, ¶ 8. These facts are not in dispute.

[162] Joint Exhibit 47.

[163] Joint Exhibit 49.

heading feature on Rose Point also shows the Vessel turning to port, and the swing meter shows the head of the tow sliding two feet per second to port.[164] The Vessel was traveling four miles per hour at this time.[165] The uncontradicted testimony of Claimants' expert Ryan was that, at four miles per hour, the Vessel was not simply drifting, but was "underway and making way."[166]

Giordano testified that he was not intending to turn to port during those three minutes.[167] From that point (3:22:40) until the time of the allision, Giordano made no effort to correct the course of the Vessel.[168] During the entirety of the approximately three minutes between when the Vessel and tow began to swing port and the allision, Giordano was checking the Rose Point weather feature.[169]

As mentioned elsewhere, Deloach admits that Giordano was negligent in causing the allision[170] and that he violated Inland Rule 5,[171] which states that "[e]very vessel shall at all times maintain a proper look-out by sight and hearing as well as by all available means appropriate in the prevailing circumstances and conditions so as to make a full appraisal of the situation and of the risk of collision."[172] Deloach specifically admits that, in the three minutes before the bridge allision, Giordano remained focused on Rose Point's weather screen because of his concern about the potential for patchy fog ahead and did not pay appropriate attention visually nor to his navigational aids to inform him that the head of his tow of barges was drifting to the north bank

---

[164] Doc. 105 at 133–34 (Giordano).
[165] *Id.* at 134–35 (Giordano).
[166] Doc. 100 at 178 (Ryan).
[167] Doc. 105 at 135 (Giordano).
[168] *Id.*
[169] *See* Doc. 101 at 36 (Giordano) (admitting that he was "checking the weather the whole three minutes").
[170] Doc. 108 at 25, ¶ 5; *see also* Doc. 102 at 19 ("So it's a stipulation of liability, pure and simple."); Doc. 109 at 3, ¶ I.3.
[171] Doc. 110 at 2.
[172] Doc. 109 at 38–39 (citing 33 C.F.R. § 83.05).

of the waterway.[173] Giordano's attention to Rose Point's weather screen included the time immediately before the allision with the Bridge.[174]

Giordano admitted that, some ten to fifteen minutes earlier (while the Vessel was at a standstill across the canal), he had also checked the weather on Rose Point.[175] He admitted that, in those ten to fifteen minutes, the weather forecast did not change.[176] He agreed that there was no point in checking the Rose Point weather again because he already knew its forecast, but he did so because he was nervous.[177] Claimants' expert Moore confirmed (and this is not in dispute) that, because the National Weather Service releases weather updates only four times a day, during the three minutes before the allision, Giordano would have been reading the same weather report he had already seen ten minutes earlier.[178]

Giordano admitted that during the three minutes before the allision, if he had looked at his radar, the Rose Point ghost predictor, heading, slide indicators, swing meter, or even out the window, he would have been able to tell that the Vessel was continuing to swing to port.[179]

Moore testified that, for the first minute and a half of the Vessel's veer to port, Giordano could have corrected course and likely avoided hitting the Bridge.[180] Similarly, Ryan opined that Giordano might have had up to two minutes to avoid the allision.[181]

While Deloach concedes Giordano's negligence in causing the allision and Deloach's liability for Giordano's negligence, there are several points surrounding the allision which are

---

[173] Doc. 108 at 15, ¶ 71 (citing Doc. 105 at 67–68 (Giordano); Doc. 101 at 36 (Giordano)); *see also id.* at 15, 18–19, ¶¶ 70, 86.
[174] *Id.* at 15, ¶ 70 (citing Doc. 101 at 58 (Giordano); Doc. 105 at 59 (Giordano)).
[175] Doc. 105 at 135–36 (Giordano).
[176] *Id.* at 136 (Giordano).
[177] *Id.*
[178] Doc. 100 at 111 (Moore).
[179] Doc. 105 at 142–43 (Giordano); Doc. 101 at 4 (Giordano).
[180] Doc. 100 at 116–17 (Moore).
[181] *Id.* at 173 (Moore).

disputed: (1) Did Giordano realize right before the allision that he was going to hit the bank, and did he put the Vessel in "full astern" in order to avoid or mitigate the allision (as Petitioner claims) or did he strike the Bridge while the Vessel was making way at 3.8 miles per hour (as Claimants contend)? (2) Did Giordano know that he hit the Bridge (as Claimants contend), or did he believe that he had merely run his tow onto the bank (as Petitioner contends)? And (3) was Giordano's prolonged use of Rose Point's weather feature in the three minutes before the allision the result of a mere error of navigation caused by a loss of situational awareness (as Petitioner claims) or a reflection of Giordano's incompetence resulting from Deloach's failure to properly train him?

On the issue of whether Giordano attempted to avoid allision, Giordano testified that, when he realized that the Vessel was getting close to shore, he put the Vessel in "full astern" (i.e., reverse).[182] During trial, Cashio seemed to support that view by testifying that he heard the engines "rev up" before the allision.[183] Claimants, however, point to various items of evidence which they argue support their position that Giordano made no effort to slow the Vessel before the allision,[184] including the testimony from one of their experts that full reversal of the engines would have caused a violent shaking of the Vessel,[185] which is not seen on the CCTV video.[186]

Regarding whether Giordano knew or should have known that he hit the Bridge (as Claimants maintain) or, instead, reasonably believed that the head of his tow ran onto the north bank or shoreline of the waterway just below the Bridge (as Petitioner claims), again, there is conflicting evidence. According to Petitioner, at the time of the allision, Giordano did not believe that he had made contact with the Bridge and in fact, did not even know that there was a bridge

---

[182] Doc. 101 at 39 (Giordano).
[183] Doc. 100 at 25–27 (Cashio).
[184] Doc. 109 at 15–16, ¶ 20. This evidence is discussed in more detail elsewhere in the Court's Ruling.
[185] Doc. 100 at 179 (Ryan).
[186] *Id.* at 109–10 (Moore); Doc. 101 at 9–10 (Giordano); *see* Joint Exhibit 48.

running parallel to the waterway since it was not lighted or fendered.[187] Petitioner argues that, according to Giordano as well the visual evidence from the CCTV recording, Giordano was not aware—and it was not readily apparent—that contact was made with the Bridge. Petitioner contends that, when watching the CCTV recording during trial, the Court could not discern when the touching of the bank or the allision occurred.[188] Therefore, Giordano reasonably thought that the tow had touched up on the bank of the waterway.[189]

Petitioner also points out that a much more experienced master, Boudreaux, testified that he had been through that area from the Bayou Boeuf Locks east of the Intercoastal Waterway more than 50 times and was not aware of the Bayou Ramos Bridge before this incident.[190] It was only later on the morning of December 23—during Boudreaux's watch—that Boudreaux was contacted by the Coast Guard by cell phone to inform him of the allision with the Bridge. The Coast Guard instructed Boudreaux to halt the progress of the tow to allow them to board for their investigation.[191] At that point, Boudreaux had Giordano awakened to question him about the allision. When informed of the allision, Giordano "said he didn't think he hit the bridge but he got close."[192] According to Petitioner, Giordano gave a written statement on the day of the allision, wherein he repeated his belief that he did not hit the Bridge.[193]

Claimants, on the other hand, argue that Giordano knew or should have known that he struck the Bridge since, at the time, the Vessel was traveling 3.8 miles per hour.[194] They cite to the

---

[187] Doc. 108 at 16, ¶ 75 (citing Doc. 105 at 54, 58–59, 68–69 (Giordano); Doc. 101 at 6, 26 (Giordano)).

[188] *Id.* at 19, ¶ 88 (citing Doc. 105 at 66–67 (Giordano)).

[189] *Id.* (citing Doc. 105 at 54, 58–59, 68–69 (Giordano); Doc. 101 at 6, 26 (Giordano)).

[190] *Id.* at 16–17, ¶ 76 (citing Doc. 103 at 135–36, 166 (Boudreaux)).

[191] *Id.* at 18, ¶ 82 (citing Doc. 103 at 135 (Boudreaux)).

[192] *Id.* at 18, ¶ 83 (citing Doc. 103 at 151–57 (Boudreaux)).

[193] *Id.* at 18, ¶ 84 (citing Doc. 105 at 53–54 (Boudreaux); Joint Exhibits 14, 15).

[194] Doc. 109 at 16, ¶ 21 (citing Doc. 101 at 8 (Giordano)).

testimony of Deloach's expert Captain Rene Cheramie, who testified that he has never hit a bridge and not known about it and would expect that someone would know if he hit something.[195]

Claimants ask the Court to consider Boudreaux's deposition, where he testified that when he learned from the Coast Guard that there had been an allision and called Giordano to the wheelhouse, Giordano admitted to hitting the Bridge.[196] At trial, Boudreaux first testified that Giordano admitted that he hit the Bridge, as Boudreaux stated in his deposition; moments later, however, Boudreaux changed his testimony, claiming that Giordano did not actually admit that he hit the Bridge.[197] When confronted with his deposition testimony, Boudreaux claimed that his memory was better at trial than it was at the deposition.[198]

Regarding Giordano's use of the Rose Point weather feature during the three minutes before the allision, the parties' arguments mirror those made in connection with his alleged prolonged use of Rose Point while the MISS MOLLYE D was at a standstill some fifteen or so minutes before the allision.

### I.   After the Allision

Much of the evidence regarding what happened after the allision is undisputed. The main area of disagreement is whether Giordano's conduct during this time demonstrates his incompetence.

### 1.   *Alleged Lack of Investigation & Reporting of Incident*

Immediately after the Vessel allided with the Bridge, at 4:21:45 on the CCTV timestamp (or roughly 3:26:00 on the Rose Point timestamp), Giordano shined the Vessel's spotlight on the

---

[195] *Id.* (citing Doc. 101 at 101 (Cheramie)).
[196] *Id.* at 21, ¶ 30 (citing Doc. 103 at 153–54 (Boudreaux)).
[197] *Id.* (citing Doc. 103 at 151–53 (Boudreaux)).
[198] *Id.* (citing Doc. 103 at 154 (Boudreaux)).

Bridge (which was "right in front of [his] tow") for "about a second."[199] Some 13 to 14 minutes after the allision, at 3:39:55 Rose Point time, when Giordano cleared the bank,[200] he shined the Vessel's spotlight at the Bridge a second time for "a few seconds."[201] This was "the totality [of Giordano's] investigation of whether [he] hit the bridge."[202]

Following the allision, Giordano did not tell his deckhand Cashio about the allision or instruct Cashio to investigate the head of the tow to see if there was any damage, and other than the few seconds when he shined the spotlight on the Bridge, Giordano conducted no investigation himself.[203] He did not wake Boudreaux to report the event immediately after it occurred, nor did he report it to Boudreaux during the watch change at 0600 hours, some two-and-a-half hours later.[204] Giordano also did not report the event to Deloach or to the Coast Guard.[205] Claimants argue that Giordano's failure to report the allision or grounding or near miss violated Deloach's policies.[206]

Petitioner responds that the reason why "Mr. Giordano did not tell anyone about the contact with the bridge . . . at 6:00:00 during watch change, or at any time before [was] because he did not know that such a contact had occurred in the first place."[207]

### 2. *Wrong Overtaking Signal*

At around 3:28:45, as Giordano was trying to work his tow off the area where it had allided with the Bridge, he had a conversation over the radio with another vessel called the PHILLIP,

---

[199] Doc. 101 at 11–12 (Giordano).
[200] *Id.* at 22–24 (Giordano).
[201] *Id.* at 23–24. (Giordano); *see* Joint Exhibit 50.
[202] Doc. 101 at 24 (Giordano).
[203] *Id.* at 12–13, 16 (Giordano).
[204] *Id.* at 19–20, 27, 29 (Giordano).
[205] *Id.* at 17 (Giordano).
[206] Doc. 109 at 17–18, ¶ 24.
[207] Doc. 110 at 13.

which was nearby.[208] Claimants argue that Giordano was confused and thought that the PHILLIP was navigating westbound, towards the MISS MOLLYE D, which would put the PHILLIP in a passing, not overtaking, position.[209] Giordano therefore suggested to the PHILLIP the wrong overtaking signal.[210] The PHILLIP had to correct Giordano and remind Giordano that the PHILLIP was behind the MISS MOLLYE D.[211] According to Claimants, Giordano admitted that he was "not paying attention" to the PHILLIP's position, even though she had been following the MISS MOLLYE D since she departed the locks.[212]

Petitioner, on the other hand, states that its navigation expert, Admiral William Baumgartner, as well as Claimants' expert Moore, both concluded that Giordano's radio communications to confirm the passing arrangement with the PHILLIP were conducted in a prudent manner.[213]

### 3. Giordano's Response to Twisted Tow

Once the Vessel was free, Giordano again proceeded eastbound.[214] At about 03:51:27, a vessel called the CAPTAIN BOO called the MISS MOLLYE D over the radio and told Giordano that the CAPTAIN BOO could hear the barges in the MISS MOLLYE D's tow twisting.[215] Claimants argue that, because the wires had been tightened when the Vessel transited the Bayou Boeuf Locks,[216] and because of the earlier perceived grounding/near miss, Giordano should have suspected that the sudden twisting of the barges was a sign that he had hit the Bridge or, at the very

---

[208] Doc. 101 at 20–22 (Giordano). At 3:39:55—some 11 minutes later—Giordano was able to free the MISS MOLLYE D from the Bridge. (*Id.* at 22 (Giordano); *see also* Joint Exhibit 50.)

[209] Doc. 109 at 18–19, ¶ 25 (citing Doc. 101 at 21 (Giordano)).

[210] *Id.*

[211] *Id.*

[212] *Id.*; Joint Exhibit 47.

[213] Doc. 108 at 17–18, ¶ 80 (citing Doc. 103 at 38–40 (Baumgartner); Doc. 100 at 125, 135 (Moore)).

[214] Doc. 101 at 24 (Giordano).

[215] *Id.* at 25 (Giordano).

[216] Doc. 105 at 110–11 (Giordano).

least, that something was not right.[217] Claimants note that when Giordano directed Cashio to tighten the wires, Giordano did not tell Cashio about his perceived near miss with the Bridge earlier, nor did he explain why the tow needed to be checked.[218]

Petitioner responds that Giordano "'did not seem to find [it] odd' that the tow's wires were loose."[219] Giordano sent Cashio onto the barges to use ratchets to tighten down the tow wires and, according to Petitioner, "[t]o do this work, Cashio followed the company safety rules to notify the pilot, carry a flashlight, wear a cap with a bill and inform the pilot on his return. For this work, Cashio did not have to go to the front or head of the barges."[220]

### 4. *Second Loitering Across the Channel*

According to Claimants, "[a]t around 4:37:20, Giordano loitered again, letting his tow take up most of the navigable channel."[221] "He testified that he was simply trying to run out the clock before having to make the upcoming bend and handing the Vessel over to Captain Boudreaux, a more experienced mariner."[222] "He wanted someone more familiar with the area to take the boat through the upcoming bend."[223]

Petitioner, on the other hand, states that two of the navigation experts, Baumgartner and Moore, concluded that at no time did the operation of the MISS MOLLYE D by Giordano impede the navigation of another vessel.[224]

---

[217] Doc. 109 at 19–20, ¶ 27 (citing Doc. 101 at 26 (Giordano)).
[218] *Id.* (citing Doc. 101 at 27 (Giordano); Doc. 100 at 12–13 (Cashio)).
[219] Doc. 110 at 12 (quoting Doc. 109 at 40) (citing Doc. 109 at 19–20, ¶ 27).
[220] Doc. 108 at 17, ¶ 78 (citing Doc. 105 at 70–71(Giordano); Doc. 101 at 47–48 (Giordano); Doc. 100 at 14, 16, 34 (Giordano)).
[221] Doc. 109 at 20, ¶ 28 (citing Doc. 101 at 28 (Giordano)).
[222] *Id.*
[223] *Id.* (citing Doc. 101 at 29 (Giordano)).
[224] Doc. 108 at 17–18, ¶ 80 (citing Doc. 103 at 38–40 (Baumgartner); Doc. 100 at 125, 135 (Moore)).

### 5. *Communication at Watch Change*

The watch change between Giordano and Boudreaux took place between 0530 hours and 0600 hours on December 23.[225] Claimants point out that, at watch change, it was customary to discuss things like the weather, any passing agreements, groundings, or other noteworthy conditions or occurrences during watch.[226] Nonetheless, Giordano did not tell Boudreaux anything about running into the mud or having a close encounter with the Bridge, nor did he mention the twisting wires of the Vessel's tow.[227]

Petitioner concedes that, in doing their navigational assessment at the change of watch, no mention was made by Giordano to Boudreaux of a "near miss" with the Bayou Ramos Bridge.[228]

### 6. *Allision with Bridge Revealed by Coast Guard*

At around 0900 hours, the Coast Guard contacted the Vessel and asked whether the Vessel had allided with the Bridge; Boudreaux was at that time unaware of the allision and was taken by surprise.[229] After the Coast Guard called, Boudreaux directed a crew member to wake up Giordano and ask about the allision.[230] Boudreaux then ordered a deckhand to examine the head of the tow; the deckhand found chunks of concrete at the head of the lead barge, port side.[231]

Claimants point the Court to Boudreaux's deposition, where he testified that, after calling Giordano to the wheelhouse, Giordano admitted to Boudreaux that he had hit the Bridge.[232] At trial, Boudreaux again testified that Giordano admitted that he had hit the Bridge, but then Boudreaux changed his testimony moments later and claimed that Giordano did not actually admit

---

[225] Doc. 103 at 130–31 (Boudreaux).
[226] *Id.*
[227] Doc. 109 at 20–21, ¶ 29 (citing Doc. 101 at 29 (Giordano); Doc. 103 at 134 (Boudreaux)).
[228] Doc. 108 at 18, ¶ 81 (citing Doc. 101 at 18–20 (Giordano)).
[229] *See* Doc. 103 at 135–36 (Boudreaux).
[230] Doc. 101 at 29 (Giordano).
[231] Doc. 103 at 137 (Boudreaux).
[232] Doc. 109 at 21, ¶ 30 (citing Doc. 103 at 153–54 (Boudreaux)).

that he had hit the Bridge.[233] When Boudreaux was challenged with his deposition testimony, he claimed that his memory was better at trial than it was at the deposition.[234]

The parties agree that, after the allision and after the notice by Coast Guard, the entire crew, including Giordano, were subjected to drug testing pursuant to Coast Guard regulation by a certified laboratory.[235] The results of the drug testing were negative for the entire crew, including Giordano.[236]

## V.     STANDARD – LIMITATION OF LIABILITY

The Court has admiralty and maritime jurisdiction in this case under 28 U.S.C. § 1333, Federal Rule of Civil Procedure 9(h), and the Limitation of Liability Act, 46 U.S.C. § 30501 *et seq.* The Limitation of Liability Act ("the Act") provides that "the liability of the owner of a vessel for any claim, debt, or liability" "arising from . . . any act, matter, or thing, loss, damage, or forfeiture, done, occasioned, or incurred, without the privity or knowledge of the owner" "shall not exceed the value of the vessel and pending freight." 46 U.S.C. § 30523(a)–(b) (formerly at 46 U.S.C. § 30505(a)–(b)). The shipowner may only limit its liability if it had no "privity or knowledge" of any unseaworthy condition or negligent act that was a proximate cause of the accident. *Trico Marine Assets Inc. v. Diamond B Marine Servs. Inc.*, 332 F.3d 779, 789 (5th Cir. 2003). Phrased another way, the Act allows a shipowner[237] to limit its liability "only if it is '*without privity or knowledge*' of the cause of the loss." *SCF Waxler Marine, L.L.C. v. Aris T M/V*, 24 F.4th 458, 472 (5th Cir. 2022) (quoting *In re Hellenic Inc.*, 252 F.3d 391, 394 (5th Cir. 2001) (emphasis added) (quoting *Brunet v. United Gas Pipeline Co.*, 15 F.3d 500, 504 (5th Cir. 1994))).

---

[233] *Id.* (citing Doc. 103 at 151–53 (Boudreaux)).
[234] *Id.* (citing Doc. 103 at 154 (Boudreaux)).
[235] Doc. 108 at 18, ¶ 85; Doc. 109 at 21–22, ¶ 31.
[236] Doc. 88 at 3, ¶¶ 17–18; Joint Exhibits 51–57.
[237] The parties agree that Deloach is the owner pro hac vice and operator of the MISS MOLLYE D. (Doc. 1, ¶ 3; Doc. 12 at 3, ¶ 3; Doc. 13 at 3, ¶ 3; Doc. 88 at 1, ¶¶ 1–2.)

31

The burden of proof in a limitation action involves two steps divided between Claimants and Petitioner. *Farrell Lines Inc. v. Jones*, 530 F.2d 7, 10 (5th Cir. 1976). Claimants bear the initial burden to show that the personal injury, destruction, or loss was caused either by negligence or conditions of vessel unseaworthiness. *Id.*; *see also Matter of Chester J. Marine, LLC*, No. 20-214, 2021 WL 2661949, at \*4–5 (M.D. La. June 29, 2021) (deGravelles, J.) (quoting *Odfjell Chem. Tankers AS v. Herrera*, 471 F. Supp. 3d 790, 794 (S.D. Tex. 2020)); *In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mexico, on Apr. 20, 2010*, 21 F. Supp. 3d 657, 753 (E.D. La. 2014) (citing *In re Signal Int'l, LLC*, 579 F.3d 478, 496 (5th Cir. 2009)).

> A vessel can be rendered unseaworthy by having either insufficient equipment or an insufficiently competent and trained crew. *See Jackson v. OMI Corp.*, 245 F.3d 525, 527 (5th Cir. 2001). Thus, the privity or knowledge standard "obliges the owner to select a competent master." [*In re Omega Protein, Inc.*, 548 F.3d 361, 374 (5th Cir. 2008).] It also requires the owner to properly train the master and crew. *See Trico Marine Assets*, 332 F.3d at 790 (finding knowledge when the "captain was improperly trained"). It does not, however, render the owner liable for "mere 'mistakes of navigation'" by an otherwise competent crew." *In re Omega Protein*, 548 F.3d at 371 (quoting [*Brister v. A.W.I., Inc.*, 946 F.2d 350, 356 (5th Cir. 1991)]).

*SCF Waxler Marine*, 24 F.4th at 472.

"[W]hen the cause of the allision was the crew's errors, the owner's ability to limit its liability turns on whether the crew was incompetent, which the owner should have known, or whether the crew made mere mistakes of navigation, which the owner could not have known about." *Id.* at 473.

If claimants meet their initial burden, the burden then shifts to the shipowner to prove that "it had no privity or knowledge of the unseaworthy conditions or negligent acts." *Id.* at 472 (quoting *Trico Marine Assets*, 332 F.3d at 789). "[K]nowledge, when the shipowner is a corporation, is judged not only by what the corporation's managing officers actually knew, but also by what they should have known." *Id.* (quoting *Trico Marine Assets*, 332 F.3d at 789–90).

32

"[I]f the unseaworthy 'condition could have been discovered through the exercise of reasonable diligence,' a corporate owner is deemed to have knowledge of it and cannot limit its liability." *Id.* (quoting *In re Omega Protein*, 548 F.3d at 371 (quoting *Brister*, 946 F.2d at 356)). "Privity and knowledge are deemed to exist where the owners had the means of knowledge, or, as otherwise stated, where knowledge would have been obtained from reasonable inspection." *In re Deep S. Airboats, LLC*, No. 21-2085, 2023 WL 5000887, at *4 (E.D. La. Aug. 4, 2023) (quoting *Gabarick v. Laurin Mar. (Am.), Inc.*, 900 F. Supp. 2d 669, 677 (E.D. La. 2012)).

"Importantly, the owner must have privity or knowledge of the 'acts of negligence or conditions of unseaworthiness [that] *caused* the accident.'" *SCF Waxler Marine*, 24 F.4th at 472 (quoting *Farrell Lines*, 530 F.2d at 10 (emphasis added)). "The owner's knowledge of acts of negligence or conditions of unseaworthiness that did not cause the accident does not prevent the owner from limiting liability." *Id.* (citing *Farrell Lines*, 530 F.2d at 10; *In re Omega Protein*, 548 F.3d at 369–70). "However, if the injury-causing event is at least partially caused by the owner, vessel, or crew, exoneration is not proper." *In re Hilcorp Energy Co.*, No. 22-2686, 2023 WL 8558078, at *4 (E.D. La. Dec. 11, 2023) (citing *In re Omega Protein*, 548 F.3d at 370–71).

Whether a shipowner has "privity or knowledge" turns on the facts of each individual case. *Gibboney v. Wright*, 517 F.2d 1054, 1057 (5th Cir. 1975) (citing *Coryell v. Phipps*, 317 U.S. 406, 411 (1943)).

## VI.   DISCUSSION

There is very little controversy about what happened during the allision. The main areas of disagreement focus on *why* it happened. Deloach argues that it was a "mistake in navigation" caused by a momentary "loss of situational awareness."[238] Claimants maintain that it was caused

---

[238] *See, e.g.*, Doc. 108 at 1; *see also id.* at 19, ¶ 91; *id.* at 23, ¶ 109.

by an incompetent mariner whose undiscovered insufficient training and incompetence rendered the MISS MOLLYE D unseaworthy.[239]

## A. Deloach's Concessions – What Is Not at Issue

Deloach concedes that, "[i]n the three minutes before the bridge allision, Mr. Giordano remained focused on weather information from Rosepoint and the potential for patchy fog ahead but did not pay appropriate attention visually nor to his navigational aids to inform him that the head of his tow of barges was drifting to the north bank of the waterway."[240] Deloach admits that "Giordano violated the inland navigation rules by failing to maintain a proper lookout to assess the risk of the allision with the Bayou Ramos Bridge. In other words, Giordano was unduly focused on the potential for fog and did not observe, as the man at the wheel, the drift of the tow towards the north bank . . . and the Bayou Ramos Bridge."[241]

## B. The Allision – Resolving Factual Issues

What little factual controversy there is about the allision itself, the Court resolves as follows. The Court disagrees with Deloach's characterization of the tug and tow "drifting" in the minutes leading up to the allision since the evidence shows that the "engines were in gear" and that the Vessel was "making way" at 3.9 to 4 knots per hour.[242]

Furthermore, it is clear that, contrary to Giordano's testimony,[243] he did not put the engines in full astern before his tow allided with the Bridge since there would have been a violent shaking of the Vessel, which would have been evident on the CCTV video, and there is none shown

---

[239] *See, e.g.*, Doc. 109 at 40.

[240] Doc. 108 at 15, ¶ 71 (citations omitted). Cheramie, too, recognized that Giordano was looking at "basic weather" on Rose Point for three minutes, when that feature would not have shown him where the "patchy fog" was located. (Doc. 101 at 133–34 (Cheramie).)

[241] *Id.* at 19, ¶ 90; *see also* Doc. 110 at 6. Inland Navigation Rule 5 requires a mariner to use all available means to keep a proper lookout. 33 C.F.R. § 83.05.

[242] Doc. 100 at 101 (Moore); *see also* Doc. 101 at 8 (Giordano) (admitting that the Vessel was going 3.8 miles per hour at the time of allision).

[243] Doc. 101 at 39 (Giordano).

34

there.[244] This is just one of several instances in which Giordano's testimony was contradicted by physical or other persuasive evidence and, in some instances, other parts of his own testimony, leading the Court to conclude that his testimony was less than credible. Despite his sworn testimony that he put the engines in full astern, Giordano admitted that doing so would shake the vessel and that it "would make sense" that the cameras would shake.[245] He admitted that the cameras showed no shaking.[246] He also admitted that the Vessel likely did not slow down until the allision took place.[247]

The Court finds that the trial testimony of Cashio—that he heard the engine "rev up" before the allision—was also not credible and was contradicted by his deposition testimony where he made no such claim and, in fact, stated that he did not hear the engine going out of gear while in the engine room.[248] Cashio's testimony was also contradicted by that of Moore, who said that placing the engine in full astern would have shaken a person in the engine room "to his bones."[249] Cashio gave no such testimony.

As to this case's main issue, the Court finds that Giordano's allision with the Bridge was certainly the result of an error in navigation, but not merely that. Giordano's negligence went far beyond the momentary loss of situational awareness argued by Deloach. Rather, the Court finds that despite being properly licensed and undergoing the training and testing necessary for licensure, Giordano was incompetent, and his incompetence rendered the MISS MOLLYE D unseaworthy.[250] The Court finds that Giordano's incompetence was amply demonstrated, first by

---

[244] Doc. 100 at 109–10 (Moore); Doc. 101 at 9 (Giordano); Joint Exhibit 48.
[245] Doc. 101 at 9 (Giordano).
[246] *Id.*
[247] *Id.*
[248] Doc. 100 at 25–27 (Cashio).
[249] *Id.* at 109 (Moore).
[250] "[I]f incompetence results in navigational error which causes a collision, it is crew incompetence, and therefore the unseaworthiness of the vessel, which has caused the . . . damage." *Intercontinental Terminals Corp., LLC v. Aframax River Marine Co.*, No. 18-3113, 2023 WL 6367697, at *23 (S.D. Tex. Sept. 29, 2023), *aff'd sub nom.*, *Intercontinental*

35

his failure to properly use Rose Point on two separate occasions and in multiple ways, and second by multiple acts and omissions that occurred before, during, and after the allision. These two will be considered in turn.

### C. Licensure No Guarantee of Competence

A central argument by Deloach is that Giordano was competent as shown by his successful completion of the training and educational requirements necessary to hold the license which he held at the time of the allision.[251] But even Deloach's expert Cheramie admitted that, "[j]ust because Mr. Giordano got a steersman license and took a steersman course, that doesn't mean he's competent to navigate a vessel."[252] Deloach's expert Baumgartner said the same thing: "I think particularly holding a credential does not guarantee competence."[253] Cheramie also agreed that "under[going] a TOAR does not make [Giordano] competent to navigate a vessel."[254] Consistent with this expert testimony, the court in *In re Ta Chi Navigation (Panama) Corp., S.A.* stated: "While it is possible to estimate the competency of a vessel's crew by examining their experience and licenses, perhaps the dispositive measurement is their performance as crew members." 513 F. Supp. 148, 159 (E.D. La. 1981), *aff'd*, 728 F.2d 699 (5th Cir. 1984); *see also id.* at 160 ("[P]roof of the master's qualifications falls short of satisfying the burden which the shipowner has of proving that due diligence was exercised."); *In re Wilson Yachts, LLC*, 605 F. Supp. 3d 695, 701 (D. Md. 2022), *aff'd*, No. 22-1766, 2024 WL 1171207 (4th Cir. Mar. 19, 2024).

---

*Terminal Corp., L.L.C. v. Aframax River Marine Co.*, No. 23-20544, 2024 WL 4664013 (5th Cir. Nov. 4, 2024) (quoting *In re Ta Chi Navigation (Panama) Corp., S.A.*, 513 F. Supp. 148, 158 (E.D. La. 1981), *aff'd*, 728 F.2d 699 (5th Cir. 1984)).

[251] Doc. 108 at 4–12, ¶¶ 15–50.
[252] Doc. 101 at 93 (Cheramie).
[253] Doc. 103 at 69 (Baumgartner).
[254] Doc. 101 at 94 (Cheramie).

### D. Giordano's Incompetence with Rose Point

As regards Giordano's competency, the Court first considers his training in and use of Rose Point. In summary, it is clear to the Court that Giordano's on-the-job training plus, as Giordano described it, the "little video class" which Deloach provided on the use of Rose Point[255] was inadequate and ineffective. While Deloach maintains that the class was a "one-day classroom program . . . conducted at Deloach Marine Service," the citations Deloach provides to support that contention do not tell us whether the class was one day or one hour.[256] Giordano could not recall what the video showed him or how long it was.[257] Giordano could not recall whether he was tested at the end of the class.[258] He admitted that he was still learning the Rose Point weather feature at the time of the allision.[259]

The documentary evidence of Giordano's Rose Point training is entitled "Rose Point/AIS" and shows that his training was limited to "how to record the complete dimensions of the vessel and its tow configuration into the AIS for each trip . . . [and] the proper use of the Navigation System . . . , specifically including marking contacts and calculating closing/crossing distances and times."[260] The evidence shows this was only a small part of the available functions of Rose Point,[261] and the course would not have included instruction on either the ghost predictor or the weather feature,[262] both central to the cause of the allision here. It is noteworthy that, although

---

[255] Doc. 105 at 109 (Giordano).

[256] *See* Doc. 108 at 8, ¶ 30 (citing Joint Exhibit 25 at 631–73; Doc. 102 at 146–49 (Deloach)). Joint Exhibit 25 (at the referenced pages) seems to be Giordano's TOAR assessment record, but there is no specific citation to Rose Point training. The referenced pages of Deloach's testimony do not mention the length of the Rose Point class.

[257] Doc. 105 at 109 (Giordano).

[258] *Id.*

[259] *Id.*

[260] Joint Exhibit 25 at 576.

[261] Cheramie, Deloach's witness, confirmed that the Rose Point training certificate did not signify that Giordano was trained "in the entirety of Rose Point." (Doc. 101 at 111 (Cheramie).) Indeed, Cheramie testified that the certificate indicated that Giordano was "trained in inputting his tow size via AIS." (*Id.*)

[262] *See also* Doc. 100 at 143–46 (Moore) (describing what the relevant training would have included).

Deloach provided for the Rose Point training, the only evidence showing what Giordano was actually taught was the certificate[263] and Giordano's very scant memory of the class. Because the course was taught at Deloach Marine, it seems plausible that Deloach would have had access to course materials, the video, and testimony from the instructor. Yet this evidence was not offered.

Deloach also argues that, in addition to the classroom instruction and video, Giordano would have been instructed and observed using Rose Point by the captains under whom he trained in preparation for getting his steersman's and mate's licenses.[264] But Giordano himself admitted that some of the captains were familiar with Rose Point while others weren't; some were knowledgeable while others weren't; and some "d[idn't] really want to use Rose Point" at all.[265] As to the TOAR assessment in the use of navigational equipment, as mentioned earlier, both Deloach and Baumgartner testified this was no guarantee of competence. Because of this inconsistency in Rose Point training and testing, Boudreaux testified that he could not say the extent of the training which any other trainee mate/pilot would have received.[266]

While Deloach maintains that Giordano's ability to answer questions on the use of Rose Point during cross examination at trial demonstrates his proficiency in Rose Point,[267] the Court finds that his knowledge after being prepared for trial is hardly a measure of what his knowledge and abilities were at the time of the allision. Rather, the proof of the pudding is how he misused Rose Point on two separate occasions and in multiple ways.

---

[263] Joint Exhibit 25 at 576.

[264] *See, e.g.*, Doc. 108 at 7, ¶ 25.

[265] Doc. 105 at 110 (Giordano).

[266] Doc. 103 at 139–40 (Boudreaux).

[267] Doc. 108 at 16, ¶ 72 (citing, *inter alia*, Doc. 101 at 4–9, 56–57 (Giordano); Doc. 105 at 99–110 (Giordano)); *see also id.* at 16, ¶ 73 (citing Doc. 105 at 104–09 (Giordano)) (arguing that "a great deal of the cross examination of Mr. Giordano focused on his knowledge and the settings as well as the video recording from the Rosepoint for the voyage the morning of December 23, 2021").

On the second of these occasions, shortly before the allision, Giordano's continued attempt to use the Rose Point weather feature for a period of some three minutes reflects his gross incompetence, since expert witnesses for all sides indicated that (a) the Rose Point weather feature only supplied very limited information about the "patchy fog" which Giordano was concerned about and not its location, and (b) it should have taken him a small fraction of those three minutes to garner the full universe of information which the feature had to offer on this subject. Yet Giordano remained focused on the Rose Point weather screen during the entire time.

As to his lack of proficiency in Rose Point, by Giordano's own admission, he did not fully know the weather portion of the Rose Point system at the time of the allision and was "still learning" it.[268] Again, multiple witnesses testified that the Rose Point weather feature would provide very limited information regarding the fog Giordano was concerned about. Giordano himself testified that the Rose Point weather feature does not show Doppler radar, which would display the location of weather features like fog; the weather information presents simply as a written description.[269] According to Deloach's expert Cheramie, the weather feature does not show a diagram or map of where fog patches are; it will simply say "patchy fog."[270]

Claimants' expert Moore agreed that Rose Point's report regarding fog would be limited to a description that "patchy fog" would be expected in the listening area in the morning or evening, for example, but it would not give precise locations of the fog or the times it was expected to be present.[271] Ryan similarly testified that the Rose Point weather feature would not have shown a map of fog coverage.[272] "If he was properly trained he would have known or should have known

---

[268] Doc. 105 at 109 (Giordano); *see also* Doc. 101 at 131–32 (Cheramie) (giving similar testimony).
[269] Doc. 101 at 56 (Giordano).
[270] *Id.* at 134 (Cheramie).
[271] Doc. 100 at 150–52 (Moore).
[272] *Id.* at 174–75 (Ryan).

39

that the information presented on Rose Point is produced once every six hours and it is general for a very large area, not specific to his needs or what he was looking for."[273]

Giordano's lack of effective training in Rose Point is also demonstrated by the length of time that he remained focused on the weather feature, since gathering the limited information it had to offer would take a very short time. Deloach's expert Cheramie admitted to the Court that it should take five seconds or less to read.[274] Moore described that it should take just seconds to push the weather icon on Rose Point, approximately 15 seconds to scroll down to the portion of the report on Lake Charles, and about 30 seconds to read the weather report word-for-word.[275] "But to look at the weather and figure out what's going on, if you took it slow it would take you a minute."[276] Ryan opined that it would take "less than a minute."[277]

Thus, for Giordano to have taken his eyes from the tug's windows and searched for three full minutes on a weather app which could not give him the precise location of the patchy fog about which he was concerned—as he was traversing an area which was unfamiliar[278] and about which he was therefore understandably nervous[279]—demonstrates a profound ignorance of Rose Point's capabilities and limitations and incompetence.

What is even more astounding is that Giordano had checked the Rose Point weather feature only a few minutes before, when the Vessel and her tow were at a standstill across the canal. At that time, depending on which version of Giordano's testimony one accepts, he spent between five and eight minutes looking at the Rose Point weather screen.[280] So, as he began to focus on the

---

[273] *Id.* at 174 (Ryan).
[274] Doc. 101 at 135 (Cheramie).
[275] Doc. 100 at 150–51 (Moore).
[276] *Id.* at 152 (Moore).
[277] *Id.* at 174 (Ryan).
[278] Doc. 105 at 112–13 (Giordano).
[279] *Id.* at 116 (Giordano).
[280] Doc. 101 at 35 ("the whole time"); Doc. 105 at 126 ("five minutes"); *id.* at 116 ("don't recall exactly").

Rose Point weather screen a second time—this time for three minutes, as his tug and tow traveled blindly toward the Bridge—he already had what limited information the Rose Point weather feature had to offer.[281]

There was a second way in which Giordano's lack of adequate training in Rose Point manifested itself. Even if Giordano felt the need to continuously monitor the Rose Point weather feature (however unnecessary and unwarranted under the circumstances it may have been to do so at that time), he could have done so and, *at the same time*, looked at the Rose Point navigational screen so that he could have seen the Bridge toward which the Vessel and her tow were headed. As Ryan stated: "[Giordano] wasn't keeping an eye on the information on the Rose Point that was providing him with the critical collision avoidance information. The predictor line or the ghost predictor clearly showed that in a future position he would be on top of the bridge. And for those minutes prior to that happening, he was not aware that this was happening."[282] This conclusion is not contradicted.

Moore agreed that Giordano "should have been able to use weather and access the weather feature on Rose Point and not have that obscure the navigational screen."[283] Deloach's expert Baumgartner agreed that there was "nothing stopping Mr. Giordano from moving the weather screen further to the left so he [could] see the chart in front of him."[284] Giordano himself admitted as much on cross examination.[285]

---

[281] Doc. 105 at 126, 135–36 (Giordano); *see also* Doc. 100 at 153 (Moore) ("So even if he was reading the weather for . . . those three minutes—he's reading the same thing he read three minutes ago that he read for eight minutes.").

[282] Doc. 100 at 173 (Ryan).

[283] *Id.* at 111 (Moore).

[284] Doc. 103 at 82 (Baumgartner); *see also id.* at 14 (Baumgartner) (testifying that he was "not an expert in Rose Point").

[285] Doc. 105 at 123–24 (Giordano) (admitting that he "could have moved [the weather app] over to the left where [he] could still see [the navigation] chart").

Furthermore, Giordano incorrectly testified at trial that he did not believe the Bayou Ramos Bridge was marked on Rose Point and did not remember whether one could click on the icons shown on the Rose Point screen to ascertain more information.[286] He could not remember whether anyone at Deloach had told him about that feature on Rose Point.[287] Yet even Deloach's expert Cheramie testified that the Bridge is represented on Rose Point as a gray icon, and if Giordano had simply clicked on it, he could have read the words which described it as a "fixed bridge."[288]

The Court finds that, for the foregoing reasons, the MISS MOLLYE D was unseaworthy by virtue of an "insufficiently competent and trained crew." *SCF Waxler Marine*, 24 F.4th at 472 (citing *Jackson*, 245 F.3d at 527). The Court's opinion is also supported by the expert opinion of Claimants' expert Ryan that Giordano was an incompetent mariner based on "a number of factors,"[289] one of which was Giordano's "unfamiliarity with utilizing the Rose Point to its full capacities . . . as another aid to navigation to assist him in collision avoidance determinations."[290]

### E. Giordano's Rose Point Incompetence – Proximate Cause

Giordano's incompetence in using Rose Point was a proximate cause of the allision. Had Giordano been properly trained and competent in Rose Point, the accident could easily have been averted by Giordano's (a) ending his Rose Point weather search after the five seconds to a minute which it should have taken him to exhaust the weather information that Rose Point had to offer and resuming his normal lookout; (b) simultaneously using the weather feature and navigational screen and its ghost predictor feature; (c) clicking on the gray bar icon and determining that he was headed toward the Bridge; or (d) simply seeking the weather information he wanted in an

---

[286] *Id.* at 129–30 (Giordano).
[287] *Id.* at 130 (Giordano).
[288] Doc. 101 at 101 (Cheramie).
[289] The Court finds that Giordano's incompetence is reflected in his other conduct, which is discussed separately.
[290] Doc. 100 at 170–71 (Ryan).

42

alternative (and more productive) way,[291] which would have allowed him to keep a proper lookout through the tug's windows.

Moore testified that, during the first minute to a minute and a half after the Vessel began to veer to port, Giordano could have corrected course and likely avoided the allision.[292] According to Ryan, if Giordano would have recognized and corrected his error at any point within the first two minutes of his veering to port, he could have avoided the allision.[293] Thus, had Giordano been properly trained in Rose Point, the allision would not have occurred.

The Court strongly disagrees with the opinion of Deloach's expert Baumgartner that additional training in Rose Point would have had no impact on the collision because Giordano "clearly knew what all the features were."[294] This testimony is belied by Giordano's testimony that he didn't know that he could have identified the presence of the Bayou Ramos Bridge by simply clicking on the icon and then, by looking at the ghost predictor, seen that his vessel was on a collision course with the Bridge.[295] It is also belied by Giordano's testimony that he was still learning the Rose Point weather feature at the time of the accident.[296] Indeed, Baumgartner admitted that he (Baumgartner) had never checked weather on the Rose Point system[297] and, more fundamentally, had never used the Rose Point electronic software at all.[298] He frankly admitted that he was not an expert in Rose Point.[299]

---

[291] These alternatives are discussed *infra*.
[292] Doc. 100 at 116–17 (Moore).
[293] *Id.* at 173 (Ryan).
[294] Doc. 103 at 34–35 (Baumgartner).
[295] Doc. 105 at 129–30 (Giordano).
[296] *Id.* at 109 (Giordano).
[297] Doc. 103 at 60 (Baumgartner).
[298] *Id.* at 14 (Baumgartner).
[299] *Id.*

43

### F. Giordano's Rose Point Incompetence – Deloach's Privity & Knowledge

Because Claimants have met their burden to show that an unseaworthy condition of the MISS MOLLYE D proximately caused the allision, the burden shifts to Deloach to prove that it had no privity or knowledge of the unseaworthy condition (i.e., Giordano's incompetence) and that the condition could not "have been discovered through the exercise of reasonable diligence." *In re Omega Protein*, 548 F.3d at 371. "[I]f the unseaworthy 'condition could have been discovered through the exercise of reasonable diligence,' a corporate owner is deemed to have knowledge of it and cannot limit its liability." *SCF Waxler Marine*, 24 F.4th at 472 (quoting *In re Omega Protein,* 548 F.3d at 371 (quoting *Brister*, 946 F.2d at 356)).

Here, the Court finds that Deloach has failed to carry its burden. As the Court has already discussed, the evidence shows that Deloach's Rose Point training was both inadequate and ineffective. Giordano's incompetence could have been eliminated with more and better teaching and training, and his inadequacies could have been discovered through more thorough testing.[300]

Furthermore, the Court finds that Deloach personally participated in bringing about the unseaworthy condition. "[A] shipowner has privity if [it] personally participated in the negligent conduct or brought about the unseaworthy condition." *Trico Marine Assets*, 332 F.3d at 789 (quoting *Pennzoil Producing Co. v. Offshore Express, Inc.*, 943 F.2d 1465, 1473 (5th Cir. 1991)); *see also S. Oil of La. LLC v. All. Offshore, LLC*, No. 21-2337, 2024 WL 3873940, at *23 (E.D. La. Aug. 20, 2024) (concluding that "[the shipowner] is not entitled to limitation of liability because its failure to properly train [the captain] on the use the vessel's navigational equipment and his admitted lack of knowledge as to the equipment's abilities (particularly, the Rose Point system and laying same over radar) was a contributing factor to the allision and [the shipowner] knew, or

---

[300] As mentioned earlier, it is not at all clear that Giordano was ever tested. Giordano could not recall, (Doc. 105 at 109 (Giordano)), and there was no other evidence offered on this issue.

should have known, that [the captain] was not trained in the proper use of the vessel's navigational equipment").

This is because "the privity or knowledge standard 'obliges the owner to select a competent master.'" *SCF Waxler Marine*, 24 F.4th at 472 (quoting *In re Omega Protein*, 548 F.3d at 374). "It also requires the owner to properly train the master and crew." *Id.* (affirming district court's denial of limitation of liability, in part because vessel owner "failed to provide [captain] with training on the Rose Point navigation system—which resulted in [captain's] not using all available means to maintain a proper lookout" (citing *Trico Marine Assets*, 332 F.3d at 790 (finding knowledge when the "captain was improperly trained"))). Here, Deloach failed to properly train Giordano in the use of Rose Point, an important piece of navigation equipment which Deloach expected Giordano to use and which, had it been used properly, would have prevented the allision.

Deloach attempts to distinguish the cases relied upon by Claimants because, in those cases, the captains "had *no* training," while here Giordano did have some training in Rose Point.[301] Deloach points to no case drawing this distinction. Indeed, the Fifth Circuit stated in *SCF Waxler Marine, L.L.C. v. Aris T M/V* that "[a] vessel can be rendered unseaworthy by having . . . an *insufficiently* competent and *trained* crew." *SCF Waxler Marine*, 24 F.4th at 472 (emphasis added) (citing *Jackson*, 245 F.3d at 527). It went on to explain: "[T]he privity or knowledge standard . . . requires the owner to *properly* train the master and crew." *Id.* (emphasis added) (citing *Trico Marine Assets*, 332 F.3d at 790). To hold that a vessel owner can meet its burden by showing that it merely trained its captain when the training was clearly insufficient, would defy logic, common sense, as well as the plain language quoted above.

---

[301] Doc. 110 at 8–9 (emphasis added).

Deloach's suggestion also runs counter to the Fifth Circuit's holding in *Gautreaux v. Scurlock Marine, Inc.*, 84 F.3d 776, 778 (5th Cir. 1996), *reinstated in pertinent part*, 107 F.3d 331 (5th Cir. 1997) (en banc). There, a relief captain was personally trained on how to use the vessel and its winches by the president of the vessel's corporate owner and the vessel's permanent captain. *Id.* at 778. Neither told the relief captain "that while using the manual crank handle he should not leave the handle on the winch motor when attempting to engage the winch by pressing the electric ignition switch." *Id.* at 778–79. When the relief captain sued for injuries suffered while using the subject winch, the vessel owner claimed entitlement to limitation. *Id.* at 779. The Fifth Circuit affirmed the district court's denial of limitation of liability finding that "the evidence established that Scurlock, the vessel owner, negligently failed to train Gautreaux in the *proper* operation of the electric winch and that this failure in part caused Gautreaux's injuries." *Id.* at 783–84 (emphasis added). Similarly, here, Deloach negligently failed to train Giordano in the proper use of Rose Point and to ensure his competence in the full use of its features.

The Court notes that the Coast Guard's action against Giordano also supports the Court's conclusion that Giordano's conduct in causing this allision was no mere error of navigation or momentary loss of situational awareness. Following the event, the Coast Guard "took action" against Giordano's license and offered him a "corrective action" which consisted of a "a year-long suspension, some classes that [he] would have to take, and a hair follicle test every couple of months."[302] The requirement that he take classes especially suggests that the Coast Guard felt there was a deficiency in his knowledge and/or training. Rather than agree to these conditions, Giordano chose instead to "voluntarily submit[] [his] credential back to the Coast Guard."[303]

---

[302] Doc. 101 at 30 (Giordano). The Court notes that Giordano tested negative for drugs or alcohol shortly after the allision. (*Id.* at 48 (Giordano).)
[303] *Id.* at 30–31 (Giordano).

46

### G. Giordano's Broader Incompetence

In addition to his incompetence in using Rose Point, Giordano's conduct before and after the allision shows his broader incompetence as a mariner. At the time of the allision, Giordano was inexperienced[304] since his first opportunity to act as a mate/pilot was when he was re-hired by Deloach in March 2021, less than a year before the accident.[305] There is conflicting evidence as to how much Giordano actually piloted a vessel from March 2021 until October 2021 since, during that time, he was hired and working as a deckhand.[306] The Court need not resolve this dispute. Even giving Deloach the benefit of the doubt, Giordano was still inexperienced at handling the Vessel without supervision at the time of the allision.

In addition, Giordano was specifically inexperienced with this waterway, which he was navigating for only the second or third time when the allision occurred.[307] On one of the two prior occasions when Giordano was in the wheelhouse on this waterway, his vessel allided with another.[308] Deloach principal Zeland David Deloach described what his investigation revealed about what happened:

> Mr. Giordano was steering the vessel and had to run down to the bathroom and when he came back up—then the captain took the wheel. And when he came back up the captain told him—he said, okay. There's a vessel coming eastbound. We're going to be meeting him on the whistle side and he handed him the stick. And *Joe didn't get himself properly lined up* and—he was lined up with all of the equipment that was along the bank except this one that was sticking out an extraordinary distance and they rubbed the end of it. But prior to making actual contact, the captain took the vessel back over and completed whatever maneuver he had to to get off of it.[309]

---

[304] "A captain's record and years of experience are relevant to th[e] inquiry" of "whether the crew was incompetent, which the owner should have known, or whether the crew made mere mistakes of navigation, which the owner could not have known about." *SCF Waxler Marine*, 24 F.4th at 473 (citing *Kristie Leigh Enters. v. Am. Com. Lines*, 72 F.3d 479, 482 (5th Cir. 1996)).

[305] Doc. 105 at 87 (Giordano).

[306] *Id.* at 74, 89 (Giordano); *see also id.* at 94–95 (Giordano).

[307] *Id.* at 112–13 (Giordano).

[308] Doc. 100 at 90 (Deloach).

[309] *Id.* (emphasis added).

47

From the above testimony, it is clear that Zeland David Deloach himself believed that Giordano had played some role in the incident, [310] although Giordano was not disciplined as a result of the allision.[311]

Giordano's account of the accident as given in his deposition is consistent with that given by Zeland David Deloach. "I had stepped down to use the bathroom. When I had come back up the pilot had or—the master of the vessel had informed me that he had made arrangements to meet another vessel in a bend. . . . And during the passing of [that vessel] and myself, *I got set off to the starboard side* and made contact with a stationary supply boat I believe it was."[312] In briefing, Petitioner also notes that, when the master handed the sticks back to Giordano, Giordano "got 'too wide,'" such that the master retook control of the vessel before the allision.[313]

Furthermore, Giordano's relative inexperience in transiting this area along with his preoccupation with reports of patchy fog played a role in his decision to bring the Vessel to a virtual stop across the canal at approximately 3:06 a.m.[314] Giordano explained: "I had heard about patchy fog. I had been in this area . . . twice; once with a good passage; once with a bad accident— or not a bad accident, but a collision. So I was hyperaware to [sic] not wanting to transit if the weather was going to get bad."[315]

Giordano's response to this concern was to cause or allow the Vessel and her tow to block the entire channel for a period of some eight minutes.[316] Ryan analogized this to "a car parked sideways on a one lane road."[317] The Court agrees with Moore that this was a violation of Inland

---

[310] *Id.*

[311] Doc. 105 at 58 (Giordano).

[312] Doc. 100 at 182 (Ryan) (emphasis added) (reading Giordano's testimony). This event was a "cumulative" factor contributing to Ryan's conclusion that Giordano was incompetent. (*Id.* at 183–84.)

[313] Doc. 110 at 5 (citing Doc. 108 at 6–7, ¶¶ 23–24).

[314] Doc. 105 at 113–16 (Giordano).

[315] *Id.* at 116 (Giordano).

[316] *Id.* at 113–14 (Giordano).

[317] Doc. 100 at 178 (Ryan).

Rule of Navigation 9, which states that "[a] vessel proceeding along the course of a narrow channel or fairway shall keep as near to the outer limit of the channel or fairway which lies on her starboard side as is safe and practicable."[318] While Deloach argues correctly that this by itself did not cause the allision,[319] the Court finds that this is another example of Giordano's incompetence, which did cause the allision.

Giordano's varying accounts of what he did during the approximately eight minutes that he kept the Vessel stopped is another example of his lack of reliability and credibility. At one point in his trial testimony, Giordano agreed that he was "checking the weather the whole time."[320] At another point, he said that he was checking the weather for the first five minutes that he was stationary but then stopped checking.[321] At yet another point, he said that it is "possible" that he was checking the weather on Rose Point but "d[idn't] recall exactly."[322] But whether Giordano checked the Rose Point weather feature for five minutes or for "the whole time," it is clear from the foregoing discussion that only a minute or so would have been all that a competently trained mariner would have needed to gather all that Rose Point could offer on "patchy fog."

In addition, the evidence is clear that there were a variety of other more effective ways that Giordano could have checked the weather at any point along the way (when his Vessel was at the Bayou Boeuf Locks, at a standstill, or in the minutes before the accident) that he did not utilize. For instance, Giordano admitted that it would have been a "pretty good idea" to call the vessels

---

[318] 33 C.F.R. § 83.09(a)(i).
[319] Doc. 110 at 16.
[320] Doc. 101 at 35 (Giordano).
[321] Doc. 105 at 126 (Giordano).
[322] *Id.* at 116 (Giordano).

ahead of him, including the one who reported patchy fog, to find where it was located.[323] Deloach's expert Cheramie agreed that this was an available alternative.[324] But Giordano didn't do it.[325]

Moore testified that Giordano could also have pressed the weather button on his VHF radio to listen to the weather broadcast without needing to take his eyes from the tug's windows.[326] Moore also testified that one of the best ways that Giordano could have learned of local weather conditions was through the radio weather channel, which uses a robotic voice to read weather reports on a loop.[327] This would have allowed Giordano to listen without taking his eyes off the Vessel's path,[328] but he did not do so.

Another option open to Giordano was given by Boudreaux, who was off duty and sleeping at the time. Boudreaux testified that an on-duty wheelman who is nervous about his route should ask for help from an off-duty wheelman, which Boudreaux has done before.[329] He testified that Giordano could have awakened him if he had any navigational concerns because Boudreaux was more experienced and was senior to Giordano.[330] Even Deloach's expert Baumgartner testified that "it probably would have been a good idea" for Giordano to have called someone with more experience, "whether shoreside or Captain Boudreaux," for assistance.[331] Cheramie also agreed that a concerned mariner could have awakened the more experienced mariner for assistance.[332] Giordano did not do so.

---

[323] *Id.* at 114–15 (Giordano).
[324] Doc. 101 at 114 (Cheramie).
[325] Doc. 105 at 115 (Giordano).
[326] Doc. 100 at 141 (Moore).
[327] *Id.* at 103–04 (Moore).
[328] *Id.* at 104–05 (Moore).
[329] Doc. 103 at 149–50 (Boudreaux).
[330] *Id.* at 149 (Boudreaux).
[331] *Id.* at 56 (Baumgartner).
[332] Doc. 101 at 115 (Cheramie).

These acts and omissions before the allision bespeak not an isolated act of negligence but inadequate training and/or incompetence. So do the events which followed the allision.

The Court finds it unnecessary to decide whether Giordano knew that the tow of the MISS MOLLYE D allided with the Bridge (as argued by Claimants) or only thought that he had "touched up on the bank"[333] or "run up into the mud,"[334] (as Deloach contends).[335] Even if Giordano believed that he had only touched up on the bank, he nonetheless violated Deloach's policies in three ways.

First, according to those policies, in order to determine what action a mariner needs to take following a grounding, he must determine if it was a "serious" grounding (i.e., one in which the tow cannot get off the ground within one hour or equipment damage occurs).[336] Therefore, in order to determine if the grounding is "serious," an investigation must be made to determine if there is equipment damage.[337] But Giordano made no investigation.[338] He did not inspect the tow, nor did he send his deckhand to do so. While Giordano did shine his spotlight on the Bridge immediately after the allision for "about a second"[339] and then, about fifteen minutes later, for a "few seconds,"[340] this was the "totality of his investigation of whether he hit the bridge."[341] The Court

---

[333] *Id.* at 6 (Giordano); *see also id.* at 10 (Giordano).

[334] Doc. 101 at 12–13 (Giordano).

[335] The Court notes that, at trial, Captain Boudreaux at first testified that Giordano had admitted to him that Giordano had hit the Bridge (as Boudreaux had earlier testified in his deposition), but then Boudreaux changed his testimony moments later and claimed that Giordano did not actually admit that he had hit the Bridge. (Doc. 103 at 151–52 (Boudreaux).) When confronted with his deposition testimony, Boudreaux stated that his memory was better at the time of trial than it had been at the time of his deposition, (*id.* at 152–54 (Boudreaux)), which the Court does not find believable and does not credit. However, the Court's conclusion regarding Giordano's incompetence is the same whether Giordano knew that he hit the Bridge or thought that he ran his tow into the mud.

[336] Doc. 101 at 15 (Giordano); *see also* Joint Exhibit 24 at 258. The Policy Manual defines a "minor grounding" as "one in which the tow can get off the ground within one hour and no equipment is damaged." (Joint Exhibit 24 at 258.)

[337] Doc. 101 at 15 (Giordano).

[338] *Id.* at 16 (Giordano). The first investigation of damage to the tow came only after Captain Boudreaux was advised by the Coast Guard at around 9:44 a.m. on December 23, 2021, that there had been an allision. (Doc. 103 at 135, 156–57 (Boudreaux).) The Court finds that Giordano's briefly illuminating the Bridge with his spotlight does not constitute an "investigation" as envisioned by the policies.

[339] Doc. 101 at 11 (Giordano).

[340] *Id.* at 24 (Giordano).

[341] *Id.*

51

finds that this does not constitute an investigation within the meaning of the policy's requirement since first, it failed altogether to examine damage done to the "equipment," i.e., to the barge and second, the few seconds of shining the spotlight on the Bridge was clearly inadequate to determine if there was damage to the Vessel's tow or to the Bridge.

Had Giordano done an actual investigation as required by Deloach's policy, he would have determined that there was obvious damage to both the tow[342] and the Bridge.[343]



---

[342] Joint Exhibits 23, 87.
[343] Joint Exhibits 118a–c.



Second, as Giordano admits, even if it was a minor grounding (i.e., "one in which the tow can get off the ground within one hour and no equipment is damaged"),[344] Deloach's policies required him to call and report same to Deloach[345] and to the Coast Guard.[346] Giordano did neither. Even Deloach's expert Baumgartner agreed that this was a violation of Deloach's policies.[347]

Third, even if Giordano thought that he did not hit the Bridge, it was clearly—by Giordano's own admission—a "near miss."[348] Therefore, Deloach's policy required Giordano to report same to Deloach management. Giordano admitted that he did not and thus violated Deloach's policy.[349] Deloach's expert Baumgartner agreed that "he would have expected" a mariner who had a close call of this kind to do some investigation to make sure he had not in fact

---

[344] Doc. 101 at 16 (Giordano); *see also* Joint Exhibit 24 at 258.
[345] Doc. 101 at 16–17 (Giordano); *see also* Joint Exhibit 24 at 258.
[346] Doc. 101 at 16–17 (Giordano); *see also* Joint Exhibit 24 at 258.
[347] Doc. 103 at 93–94 (Baumgartner).
[348] Doc. 101 at 17–18 (Giordano).
[349] *Id.* at 19–20 (Giordano); *see also* Joint Exhibit 24 at 63.

hit the Bridge.[350] Baumgartner admitted that Giordano violated the "near miss" policy when he failed to report it.[351] In briefing, Deloach also admits that Giordano did not report it when he should have and thereby violated Deloach's policy.[352]

The Court finds that Giordano's incompetence is also demonstrated by a failure to follow a well-established and important practice at Deloach. When Boudreaux relieved Giordano from watch at 0600 hours, Boudreaux and Giordano had a "watch change," where, Boudreaux testified, it is customary to discuss things like the weather, any passing agreements, allisions, or other noteworthy conditions or occurrences during watch.[353] Yet, as stated above, Giordano did not tell Boudreaux anything about running into the mud or having a perceived "near miss" with the Bridge, nor did he mention that the CAPTAIN BOO had reported that the MISS MOLLYE D's barges were twisting or that Giordano had sent Cashio out to tighten the wires on the barges.[354] These are precisely the kinds of unusual and potentially significant events which a competent mariner could be expected to reveal to his successor at watch change. Yet Giordano remained silent.

Furthermore, even though the CAPTAIN BOO told Giordano that the MISS MOLLYE D's "barges were twisting,"[355] Giordano didn't ask Cashio to inspect the bow of the barge to see if there was any damage caused by the grounding,[356] despite the fact that Giordano thought (by his own account) that he had run his tow into the mud, and (by his own account) had a near miss with the Bridge. While this does not violate a formal Deloach policy, it reinforces the Court's conclusion that Giordano was not well-trained and was incompetent.

---

[350] Doc. 103 at 89–90 (Baumgartner).
[351] *Id.* at 94–95 (Baumgartner).
[352] Doc. 108 at 19, ¶ 89.
[353] Doc. 103 at 130–31 (Boudreaux).
[354] Doc. 101 at 29 (Giordano); Doc. 103 at 132 (Boudreaux).
[355] Doc. 101 at 26–27 (Giordano).
[356] *Id.* at 26–29 (Giordano). He only sent Cashio out to "tighten the wires." (*Id.* at 27 (Giordano).)

Regarding the wrong overtaking signal given to the PHILLIP and the MISS MOLLYE D's loitering after the allision, discussed above, the Court finds that, while relatively minor incidents in comparison to Giordano's more egregious errors, they are consistent with his prior conduct and the Court's conclusion that he was not a competent mariner.

The Court carefully considered the expert testimony of Deloach's expert Baumgartner. The Court has two main reasons for rejecting his opinion that Giordano "was a competent mariner that made an error when he was distracted."[357] First, the opinion flies in the face of the overwhelming evidence to the contrary, discussed above, which evidence includes Baumgartner's concessions that, following the allision, Giordano violated a number of Deloach's policies.

Second, while Baumgartner undoubtedly has impressive credentials and qualifications, he admitted that he has never operated an inland towing vessel on this waterway or any waterway.[358] This must be contrasted with the experience of Moore, who had "900 documented trips through that area" on a vessel.[359] And while Ryan had limited experience in operating towboats,[360] he is well qualified in marine safety and, indeed, conducted two or three "live navigational audit[s]" in the area where the allision took place, "which determined the competency and degree of accuracy of a company's procedures concerning safe navigational practices and determine[d] the competency of the individuals as well."[361] More importantly, the expert conclusions reached by Moore and Ryan are consistent with and supported by the facts found by the Court.

In contrast with Baumgartner, Deloach's other expert Cheramie has a wealth of pertinent experience with towboats in this geographical region, but his opinion that Giordano was properly

---

[357] Doc. 103 at 43 (Baumgartner).
[358] *Id.* at 14 (Baumgartner).
[359] Doc. 100 at 100 (Moore).
[360] *Id.* at 157–66 (Ryan); Joint Exhibit 112.
[361] Doc. 100 at 159 (Ryan).

trained and competent[362] is simply inconsistent with the overwhelming facts demonstrating Giordano's deficient performance and incompetence before, during, and after the allision.

In conclusion, and for the foregoing reasons, the Court agrees with the expert opinion of Ryan that Giordano "was not properly trained and [was] incompetent . . . in his duties and skill as a navigational watch officer."[363] The Court likewise agrees with Moore's similar conclusion that Giordano was incompetent as demonstrated by his "multitude of errors."[364]

### H. Giordano's Broader Incompetence – Proximate Cause, Privity & Knowledge

The Court's conclusion that Giordano's broader incompetence was also a proximate cause of the allision is not based on the individual acts and omissions outlined above considered in isolation. Clearly, nothing Giordano did or didn't do after the allision could have played a role in the allision. But it is also clear that, had Giordano been properly trained generally, even in the absence of better Rose Point training, he would have kept a more vigilant lookout as he engaged in the prolonged use of the Rose Point weather feature, raising his eyes often enough to have discovered the Vessel's veering to port. Or, if he would have used one of the alternative methods of checking the weather that did not require him to take his eyes from the tug's windows, the allision would have been avoided. The Court agrees with the conclusion of Ryan that Giordano's incompetence was a cause of the accident.[365]

Regarding Deloach's privity and knowledge, it is clear that, with the exercise of reasonable diligence, Giordano's incompetence could have been discovered and corrected. For instance, according to Moore, there should have been a re-evaluation of Giordano in 2021 when Deloach

---

[362] *See, e.g.*, Doc. 101 at 124–31 (Cheramie).
[363] Doc. 100 at 177 (Ryan).
[364] *Id.* at 113–14 (Moore).
[365] *Id.* at 177 (Ryan).

re-hired him.[366] Cheramie agreed that an employer should verify that a mariner is competent to navigate a waterway before putting that mariner in charge of a vessel.[367] This is particularly relevant given Giordano's limited experience as a pilot, his unfamiliarity with the Bayou Boeuf section of the Intercoastal Waterway, and his prior accident in that waterway.

## VII.    CONCLUSION

For the foregoing reasons, the Court finds that the MISS MOLLYE D was unseaworthy by virtue of an insufficiently trained and incompetent crewmember. This unseaworthy condition was a proximate cause of the allision. The Court finds that Deloach had privity and knowledge of the unseaworthy condition because it personally participated in bringing it about by failing to properly train Giordano in Rose Point and to ensure his proficiency in same. The Court further finds that Deloach had privity and knowledge of the unseaworthy condition because it reasonably could have discovered Giordano's incompetence, both in Rose Point and generally. Therefore, the Court concludes that Deloach is not entitled to limit its liability and denies its demand for same.

Signed in Baton Rouge, Louisiana, on March 30, 2026.

**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

---

[366] *Id.* at 115 (Moore).
[367] Doc. 101 at 91 (Cheramie).